OPINION OF THE COURT
MCKEE, Circuit Judge.
William J. Brennan, a firefighter employed by the Township of Teaneck, New Jersey Fire Department, filed this § 1983 action alleging that the Township of Tean-eck, the Township Manager, and various supervisory members' of the Teaneck Fire Department engaged in a campaign of harassment and retaliation against him in violation of his First Amendment right of expression after he spoke out on certain matters of public concern. Brennan’s complaint also asserted a number of state law claims including a retaliation claim under New Jersey’s Conscientious Employee Protection Act (“CEPA”), N.J. Stat. Ann. § 34:19-2. Cross-motions for summary judgment were filed, and the district court granted summary judgment to the defendants on all of the state law claims, but Brennan’s § 1983 claim proceeded to trial.
The jury returned a verdict in Brennan’s favor on the § 1983 claim and awarded him compensatory damages against all of the defendants, and punitive damages against the individual defendants. Brennan’s victory was short lived, however, because the district court subsequently granted judgment as a matter of law to all of the individual defendants except the Township Manager. The court granted the Township Manager’s motion for judgment as a matter of law only as to the award of punitive damages. This appeal and cross-appeal followed after the district court denied additional post verdict motions. For the reasons that follow, we will affirm in part and reverse in part.[1]
I. FACTUAL BACKGROUND
Brennan began working as a firefighter for the Teaneck Fire Department on April 19, 1993, and soon became active in Local 42 of the Firemen’s Mutual Benevolent Association (“FMBA”), the firefighters’ un *354 ion. He was elected Secretary of the FMBA in November of 1993, and in 1994 he was elected to a one-year term as the FMBA’s President. He was not reelected in 1995.
Gary Saage was Teaneck’s Township Manager during the period relevant to this suit. As Township Manager, Saage’s responsibilities included making promotions within the Fire Department and appointing the Fire Chief.
William Norton was a Captain in the Fire Department in the summer of 1994, but Saage promoted Norton to Fire Chief after Norton served only a brief tenure as Deputy Chief. As Chief, Norton was responsible for the efficient operation of the Department and generally in charge of extinguishing and preventing fires. He also had general responsibility for hazardous materials in the Township. Norton was also responsible for insuring the Fire Department’s enforcement of laws and ordinances pertaining to extinguishing and preventing fires.
Brennan claims that he was an advocate for firefighters and fire safety. In July 1994, he openly opposed the Township’s decision to close two of four fire stations because he believed that the closures would endanger the public. Brennan claimed that Teaneck’s Township Council decided to close the stations pursuant to Saage’s recommendation. Brennan’s opposition included erecting signs, arranging for public announcements, distributing leaflets and expressing opposition in an interview he gave to a local reporter. Although there is some dispute about the relative roles Brennan and other firefighters played in opposing the closings, it is undisputed that Chief Norton, Deputy Fire Chief Joseph Palazzola and Captain Robert O’Neill, also openly opposed the fire station closings along with many rank-and-file firefighters. However, Brennan claims that his was the most vocal and prominent opposition and that his superiors, including Saage and Norton, were aware of it. Although both stations were closed despite opposition, they both reopened in July 1994, apparently in response to significant public pressure.
On July 26, 1994, Brennan reported that he had sustained an on-the-job shoulder injury. Under the FMBA’s collective bargaining agreement with the Township, Brennan had an absolute right to Injury on Duty (“IOD”) leave with pay for thirty calendar days. That agreement also provided that the thirty day leave period could be extended up to a maximum of one year at the discretion of the Township. Brennan began intermittently using his thirty days of paid IOD leave on July 27 and had exhausted it by December 26, 1994.
Brennan claimed that in October 1994, he publicized that the Township was circumventing directives from the “Fire Sub-Code Official.” That official is responsible for assuring compliance with fire codes applicable to building construction. According to Brennan, Saage attempted to ignore the Sub-Code Official’s directives regarding fire sprinklers in the police station; Brennan openly opposed Saage’s attempts to circumvent those directives.
That same month, Saage proposed replacing the Fire Sub-Code Official with a civilian instead of a firefighter. According to Brennan, the Fire Sub-Code Official had always been a uniformed member of Teaneck’s Fire Department, and Saage’s plan to change that was also opposed by the then FMBA President and Chief Norton. Brennan claimed that he openly challenged Saage’s proposal and that the entire Fire Department opposed it.
Brennan’s opposition included placing an advertisement in a local newspaper as well *355 as appearing at a televised Township Council meeting to explain why a civilian should not have been selected for the job. On November 9, 1994, local newspapers interviewed Brennan, and he was thereafter featured in an article opposing Saage’s proposal.
Brennan claimed that sometime in November, Deputy Chief John Bauer told Brennan that he was being transferred from Headquarters to Station 2 because Bauer was tired of hearing about employment issues and unfair labor practices. Station 2 allegedly had an older fire truck with a manual transmission. Brennan claimed that he was ordered to drive that truck and this aggravated a prior shoulder injury. He underwent surgery to correct the problem but claims that the surgery necessitated asking the Township Council to extend his IOD leave beyond the initial thirty day period. On January 3,1995, the Township Council denied the request, and on January 17, after Brennan addressed the Township Council, the Council voted 4-2 against granting Brennan’s request. Consequently, Brennan was automatically placed on workers’ compensation. Brennan claims that this was the first time that a request for an IOD extension had ever been rejected.
In January of 1995, Brennan informed the Fire Department that it was legally required to supply firefighters with station work uniforms and bunker pants. According to Brennan, Deputy Chief Palazzola later told Lt. Schroeder, Brennan’s then superior officer, that if Brennan didn’t “knock it off’ he was “going to transfer [Brennan] back to headquarters and make [Brennan’s] life miserable.” Brennan thereafter formally filed a complaint in response to this incident with the New Jersey Department of Labor. He claims that a subsequent compliance audit of the Fire Department cited the department with 200 regulatory violations.
On February 7, 1995, Brennan informed the Township Council of his job-related injury and that he had not been paid for five weeks. However, later that month, Brennan elected to return to work on light duty, even though he claimed that he was not required to do so.
On February 14, 1995, Brennan organized a public rally challenging the policy of removing firefighters from the payroll while on IOD leave, and he subsequently filed an unfair labor practice charge with the New Jersey Public Employment Relations Commission (“NJPERC”) attacking that policy.
Brennan claimed that the harassment and retaliation intensified in February of 1995 and included an improper assignment to housewatch duty despite his light-duty employment status. According to Brennan, this violated applicable department regulations. Brennan was also listed as being Absent Without Leave (“AWOL”) because he was unable to attend an evaluation with a worker’s compensation doctor. Brennan claimed he was not afforded the opportunity to reschedule the evaluation and that Saage had Brennan’s personal doctor disqualified as a treating physician, even though Chief Norton had referred Brennan to him. Brennan claimed that this caused him to lose his workers’ compensation benefits.[2]
On May 30, 1995, Brennan filed an unfair labor practice charge with the *356 NJPERC in which he alleged that the Township Council denied his request for extended IOD leave to retaliate for the unfair labor practice charge he had filed with the NJPERC regarding “outsta-tioned” firefighters attending meetings at headquarters.
Brennan was denied holiday leave for Thanksgiving, 1995, and he claimed that Deputy Chief Bauer arbitrarily chose who would have Thanksgiving Day off. When Brennan appeared for duty on Thanksgiving Day, a firefighter who had been given the day off was at work. That firefighter told Brennan that he had changed his mind about working that day.
In February of 1996, Brennan was ordered to clean Station 2’s basement so that it could be used as a union hall and office. Brennan claims that when he objected because of the presence of asbestos, Deputy Chief Palazzola threatened, “you know what’s going to happen if you make this a safety issue.” Palazzola then stopped the clean up operation, but Brennan subsequently formally complained about the asbestos to the New Jersey Department of Labor and Health. Brennan claimed that his complaint resulted in an inspection by a consulting company that recommended remedial action. As a result of his complaint, Brennan claimed that Palazzola punished him by giving him the menial, but labor-intensive, assignment of pump-training.
In addition, Brennan contended that he was involuntarily transferred from Station 2 to Station 3 the day after the consulting firm discovered asbestos, but that firefighters with less seniority were not transferred.
Brennan also calls our attention to May 14, 1996. That was an election day, and Brennan’s car was parked in the fire station parking lot which was being used as a polling place. Brennan had posted election materials on his car. Saage sent Captain O’Neill and another officer to investigate possible electioneering violations and then notified the Police Department. The incident culminated in a criminal complaint against Brennan, and Saage imposed a 21-day suspension. Brennan’s conviction for violating election laws was reversed on appeal, but Saage refused to reverse the 21-day suspension.
On May 24, 1996 Brennan was suspended for 2 days for wearing a noncompliant uniform after being recalled to duty during an emergency. He claimed that he was subsequently charged with conduct unbecoming a firefighter for reporting to work out of uniform, even though other firefighters, including Deputy Chief Palazzola, had reported to work in noncompliant uniforms without being disciplined. According to Brennan, no other firefighter has been disciplined for a uniform infraction.[3]
Later on May 24, Deputy Chief Bauer ordered Brennan to present a doctor’s note before returning to duty after Brennan called in sick. Brennan provided a note but he was accused of forging it. Brennan alleged that Captain O’Neill called his doctor, told him that Brennan was a trouble maker, and suggested that the doctor not get involved with Brennan. Brennan claimed that even though his doctor verified the note, Saage nonetheless found Brennan guilty of forging it.
On June 5, 1996, Brennan requested a “leave with substitute,” as he was entitled to under the terms of the collective bargaining agreement.[4] According to Bren *357 nan, a message was left on his home phone denying the request and requiring him to return to work on June 6, even though he was on vacation. Nevertheless, Brennan did work on June 6, because he fortuitously ended his vacation a day early and found the message.
Brennan left work early on August 9, 1996, purportedly because of the cumulative effect of a pattern of harassment and retaliation, and the emotional distress he claims it caused. Before leaving, he discussed his condition with Deputy Chief Palazzola. Brennan claimed that he thought the discussion was confidential, but that Palazzola made an entry in the company journal disclosing the reason for the early departure and making it a matter of public record. That, according to Brennan, was highly unusual.
Palazzola called Brennan on August 11, 1996, while Brennan was home on what he terms stress-induced sick leave. Palazzola informed Brennan that Brennan was being charged with conduct unbecoming a public employee because he had used a mattress in a department dormitory as a punching bag. Palazzola also told Brennan that he could not return to work without a doctor’s note.[5]
Brennan alleged that he was told that he would be given an additional year of seniority for the time he served on the Rochester, New Hampshire Fire Department shortly after he was hired as a Teaneck firefighter. He claimed that the additional year of seniority was taken away without his knowledge.
On August 23, 1996, Brennan filed the instant suit in the United States District Court for the District of New Jersey. His complaint contained numerous state law claims as well as a § 1983 claim for violation of his civil rights. He alleged that Saage, Norton, Bauer, Palazzola, O’Neill and the Township had harassed him in retaliation for his expression of opinion in violation of the First Amendment. Brennan also claimed that, within a few weeks of filing the complaint, the defendants intensified their harassment in an attempt to either force him to resign or establish grounds for firing him.
On September 13, 1996, approximately three weeks after he filed suit, Brennan was served with a Preliminary Notice of Disciplinary Action, charging him with conduct unbecoming a public employee and informing him that he would be subject to termination based upon allegedly forging a doctor’s note, abusing sick leave and interfering with the submission of a bid to a New Jersey state contract vendor.
Brennan explained that the “unbecoming conduct” charge stemmed from allegations that he abused sick leave by using it for vacation. The Township charged him with interfering with bids in connection with bids for firefighter uniforms. Brennan claimed that Saage upheld that charge although there was no evidence to support it. Saage conducted a disciplinary hearing on that charge and imposed a 63-day suspension without pay. On appeal, the suspension was reduced to ten days.
One day after the hearing on his suspension, Brennan arrived at work and found several dozen whistles hanging from a tree outside the firestation. Brennan interpreted this as an intended reference to a *358 newspaper article that had referred to him as a “whistleblower.” The whistles stayed there for several months. Brennan claimed that Chief Norton failed to investigate although he (Brennan) complained.
According to Brennan, someone named “McIntosh” purportedly wrote a commendation letter in October of 1996 recognizing Brennan’s exemplary job performance. Brennan claimed that this was the 'only such letter McIntosh had ever written in 36 years with the Fire Department.[6] Brennan insisted that Chief Norton denied receiving the letter even though McIntosh purportedly placed the commendation in Norton’s in-box.
Brennan also cited examples of firefighters who received “disparate treatment and harassment” because they associated with him despite supervisory warnings not to do so. For example, he said one of his friends, Fire Lt. DePompeo, was demoted from Lt. Firefighter to Firefighter, and that this demotion was unprecedented. According to Brennan, DePompeo was involuntarily transferred after he spoke out in support of Brennan’s reports of asbestos. Brennan also cited the denial of a friend’s leave request in violation of the collective bargaining agreement. In fact, Brennan said that the term “FOB” became a derogatory acronym for “Friend of Brennan.”
According to Brennan, the atmosphere at work deteriorated to the point that Captain O’Neill’s sole function became following Brennan around and reporting on everything that he did. O’Neill stopped addressing him as “Firefighter Brennan” and simply referred to him as “Brennan,” which, according to Brennan, was more harassment and a violation of the Department’s rules and regulations.
Brennan cited still other examples of harassment and retaliation which are too numerous to mention, and which need not be reiterated in detail. Rather, we briefly note that he claimed that he was unfairly singled out because he had a cell phone on his belt on February 21, 1998; that he was reprimanded for using too many towels to wash a fire truck; and that someone placed a sticker on his helmet that read “Department Asshole” over the word “Firefighter.” The same -month a message on the firestation television was reprogrammed with an obscenity referring to him as a homosexual. Brennan also alleged that Chief Norton asked the FMBA President to have the union write a letter saying that Brennan was not fit for duty so that Teaneck could terminate him.
Brennan claimed that there was never any meaningful investigation of any of these incidents. Deputy Chief Bauer told him that he investigated the TV and helmet incidents, but could not determine who was responsible. Brennan said that Bauer told him that this conduct did not constitute harassment and refused to conduct a follow-up investigation.
Finally, we note that Brennan alleged that in June 1998, his treating psychiatrist, Daniel Kuhn, M.D., diagnosed Brennan as having stress allegedly resulting from the harassment and retaliation and he was unable to work as a result.
II. DISTRICT COURT PROCEEDINGS
As noted above, on August 23, 1996, Brennan sued Norton, Bauer, Palazzola, O’Neill, and Saage in their individual and official capacities, as well as the Township of Teaneck. His complaint sought injunc-tive relief as well as compensatory and punitive damages, and he asserted: (1) a civil rights claim under 42 U.S.C. § 1983 based upon the purported illegal retaba *359 tion for protected speech; (2) state law claims for intentional and negligent infliction of emotional distress; (3) a retaliation claim under New Jersey’s Conscientious Employee Protection Act (“CEPA”), N.J. Stat. Ann. § 34:19-2; and (4) defamation.
The defendants filed an answer denying Brennan’s allegations and asserting affirmative defenses and state law counterclaims alleging, inter alia, fraudulent misrepresentation and defamation. Brennan thereafter amended his complaint by adding a common law claim for retaliation against all defendants. Following additional pleadings and discovery, the parties filed cross-motions for summary judgment.
On March 14, 2000, the district court entered an order: (1) denying defendants’ summary judgment motion as to Brennan’s § 1983 First Amendment claim; (2) dismissing Brennan’s state law claims; (3) denying Brennan’s cross-motions on his claims; and (4) dismissing defendants’ counterclaims. Thus, the only remaining claim was Brennan’s § 1983 claim for illegal retaliation for the exercise of protected expression. That claim proceeded to trial before a jury.
At the conclusion of the ensuing trial, after the court had denied defense motions for judgment as a matter of law, the jury returned a verdict for Brennan awarding damages as follows: (1) $382,500 in compensatory damages against all defendants; (2) $150,000 in punitive damages against Saage; (3) $90,000 in punitive damages against Norton; (4) $90,000 against Bauer; (5) $80,000 in punitive damages against Palazzola; and (6) $80,000 against O’Neill.
The district court thereafter granted the defendants’ motions for judgment as a matter of law with respect to Norton, Bauer, Palazzola and O’Neill, and also Saage’s motion for judgment as a matter of law with respect to punitive damages. However, it denied motions for judgment as a matter of law with respect to compensatory damages against the Township and Saage. Judgment was then entered in favor of Brennan and against the Township and Saage in the amount of $382,500. After the court denied additional post-verdict motions by both sides, the parties filed the instant appeal and cross-appeals.[7]
III. DISCUSSION
On appeal, Brennan argues that the district court erred by: (1) holding that certain speech was not protected under the First Amendment; (2) dismissing his claim under New Jersey’s Conscientious Employee Protection Act (“CEPA”); (3) granting judgment as a matter of law to Norton, Bauer, Palazzola and O’Neill; and (4) granting judgment as a matter of law with respect to punitive damages against Saage.[8] The Township and Saage argue *360 that the district court erred by: (1) denying their motion for judgment as a matter of law; and (2) denying their motion for a new trial, or, in the alternative, for remitti-tur. Inasmuch as these arguments substantially overlap, we will organize our discussion according to the issues raised by the competing claims.
A. Brennan’s First Amendment Retaliation Claim.
(I). General Legal Principles.
1. Public Concern
“A public employee has a constitutional right to speak on matters of public concern without fear of retaliation.” Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir.2001) (citations omitted). “While the government’s role as employer ... gives it a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large,[9] this hand cannot act with impunity.” Id. (citation and internal quotations omitted). Therefore, “[p]ublic employers cannot silence their employees simply because they disapprove of the content of such speech.” Id. (citations omitted).
However, a public employee’s right of expression is not absolute vis-a-vis his/ her employer’s right to exercise some control over its work force. Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir. 1997). Courts employ a three step analysis when balancing the First Amendment rights of public employees against competing interests of their employers. Baldassare, 250 F.3d at 194. “First, plaintiff must establish that the activity in question was protected.” Id. at 195 (citation omitted). If the speech in question is purely personal, it does not fall under the protective umbrella of the First Amendment and public employers are therefore not limited by that guarantee in responding to disruption caused by the expression. See Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Accordingly, the speech in question “must involve a matter of public concern,” id. at 147, 103 S.Ct. 1684, to qualify as “protected speech.”
“A public employee’s speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community.” Baldassare, 250 F.3d at 195 (citation and internal quotations omitted). Accordingly, “speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials.” Connick, 461 U.S. at 148, 103 S.Ct. 1684. This means that public speech cannot “constitute[ ] merely personal grievances.” Feldman v. Philadelphia Housing Authority, 43 F.3d 823, 829 (3d Cir.1994) (citation omitted). This does not, however, suggest that speech which is motivated by private concern can never qualify as protected speech. It clearly can if it addresses a matter that concerns the public as well as the speaker. See Rankin v. McPherson, 483 U.S. 378, 387 n. 11, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (“The private nature of *361 the statement does not ... vitiate the status of the statement as addressing a matter of public concern.”)’
Accordingly, “the speaker’s motive, while often a relevant part of the context of the speech, is not dispositive in determining whether a particular statement relates to a matter of public concern.” Azzaro, 110 F.3d at 978. We have “declined to distinguish between a public employee’s expression as a public employee and a public employee’s expression as a citizen.” Baldassare, 250 F.3d at 197. “Instead, we concentrate on the value of the speech itself.” Id. Common sense suggests that public employees, no less than other employees, will be more likely to speak out when they are disgruntled or personally dissatisfied with some aspect of their employment or employer. Nevertheless, the harm that results from silencing or chilling public speech is neither negated nor mitigated merely because the speaker may have harbored motivations that were less than altruistic. A public employee’s motivations may be relevant to determining the impact of his/her speech upon the public. However, those motivations will rarely, by themselves, justify silencing speech that otherwise addresses matters concerning the public. “Silencing a public employee seeking to speak on a matter of public concern deprives a self-governing society of information that may be vital to informed decision-making.” Azzaro, 110 F.3d at 977 (citation omitted). “This can be a particularly serious loss because public employees, by virtue of their constant interactions with a public officer, are often in the best position to know what ails that office.” Id. Thus, we must focus on “the content, form, and context of the activity in question.” Baldassare, 250 F.3d at 195 (citation omitted). Determining whether a public employee’s speech is a matter of public concern is a question of law for the court. Id. (citation omitted).
2. The Balance of Harm
If the plaintiff can establish that his/her speech is a matter of public concern, the court proceeds to the second step of the process. The plaintiff must then “demonstrate hisl/her] interest in the speech outweighs the state’s countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees.” Baldassare, 250 F.3d at 195 (citation omitted). This inquiry is purely legal and is therefore decided by the court as a question of law. Id. (citation omitted). Courts must balance the speaker’s First Amendment interest against any injury the public employer may suffer as a result of that expression. Baldassare, 250 F.3d at 197 (citations omitted). “On the one side, we weigh the public employee’s interest in speaking about a matter of public concern and the value to the community of [him/]her being free to speak on such matters.” Azzaro, 110 F.3d at 980 (citations omitted). “Balanced against these interests is the government’s interest as an employer in promoting the efficiency of the services it performs through its employees.” Id. (citation omitted). “Only if the value of the speech, as measured by the employee’s and the public’s interests, is outweighed by the government’s interest in effective and efficient provision of services, will [a court] hold that the speech is unprotected.” Id.
Accordingly, we must consider the nature of the relationship between the employee and the employer as well as any disruption the employee’s speech may cause, including the impact of the speech on the employer’s ability to maintain discipline and relationships in the work place. Baldassare, 250 F.3d at 198. “In calibrating the significance of the disruption, the *362 relationship between the employer and the employee is particularly important.” Id. (citation omitted). Of course, the right of expression would mean little if an employee could be silenced whenever his/her voice caused any degree of disruption or discomfort for a public employer. Therefore, the balancing cannot be “controlled by a finding that disruption did or could occur.” Id. at 200 (citation omitted). A public employee’s speech “no doubt may disrupt and demoralize much” of the public workplace. Id. (citation omitted). However, the First Amendment stands as a barrier to punishing a public employee simply because his/her speech disrupts the workplace. Id. (citation omitted). Rather, any disruption is “only [a] weight[] on the [balancing] scale.” Id. (citation omitted).
3. Causation
If a public employee’s speech concerns a matter of public concern, and the balance of harm weighs in favor of the employee’s expression, “plaintiff must then show that the protected activity was a substantial or motivating factor in the alleged retaliatory action.” Baldassare, 250 F.3d at 195 (citation omitted). However, a plaintiff will not necessarily prevail even if he/she is able to clear this last hurdle. “[T]he public employer can [still] rebut the claim by demonstrating it would have reached the same decision ... even in the absence of the protected conduct.” Id. (citation omitted). This latter causation raises an issue of fact that must be resolved by the fact finder. Id.
Our analysis of Brennan’s alleged First Amendment violation therefore begins with determining whether his expression was protected, and if so, whether the record supports a finding that the expression caused any of the defendants to retaliate against him for that expression. The outcome of our analysis is not determined by the source of the speech or the merit of its content. “Rather, the issue is whether it is important to the process of self-governance that communications on this topic, in this form and in this context, take place.” Azzaro, 110 F.3d at 977.
(II). Analysis
1. Brennan’s Speech Concerning Matters of Public Concern.
The essence of Brennan’s constitutional claim is that Saage led a campaign to punish him for speaking out on matters of public concern and that Norton, Bauer, Palazzola, O’Neill and the Township willingly assisted in that campaign. According to Brennan, the defendants retaliated against him for: (1) protesting the closing of two fire stations; (2) informing Township residents that the fire sprinklers at Teaneck’s Police Station violated the directives of the Fire Sub-Code Official; (3) opposing the proposal to replace the position of Fire Sub-Code Official with a civilian; (4) filing a complaint with the New Jersey Department of Labor over the proposal to implement uniforms and protective gear that were not fire-resistant as required by state law; and (5) informing the New Jersey Department of Labor and Health about the presence of asbestos in Teaneck’s fire stations.
The district court initially held that only the first three claims involved matters of public concern. However, in its subsequent opinion granting judgment to defendants as a matter of law, the court concluded that there was insufficient evidence to prove that Brennan had actually engaged in speech about fire sprinklers in the police station. Accordingly, the court granted judgment to defendants on Brennan’s First Amendment claim pertaining to that alleged expression. On appeal, Brennan broadly argues that his speech regarding fire sprinklers was protected. Howev *363 er, he makes no effort to refute the district court’s finding that he had not produced sufficient evidence to establish that he engaged in such expression in the first place. For their part, neither the Township nor Saage dispute the district court’s finding that Brennan’s opposition to the closings and the proposal to hire a civilian as Fire Sub-Code Official were protected speech.
The real dispute centers on Brennan’s speech regarding asbestos in the fire stations and his complaints about uniforms and protective gear. The district court found that these were not matters of public concern. Rather, the court concluded that these were “matters of personal interest which, while perhaps important to firefighters and their union, are not issues which affect the public interest.” [10] Dist. Ct. Summary Judgment Op. at 15. The Township and Saage argue that Brennan’s asbestos related expression does not concern the public because it only affects Brennan’s work place and is, at most, only relevant to him, and perhaps other firefighters who worked there. They rely on the fact that firestations are not generally open to the public. According to them, any asbestos inside of a firestation could not, ipso facto, be a matter of public concern.
Brennan, on the other hand, insists that the public’s concern is obvious because the presence of asbestos violates New Jersey’s Public Employee Occupational Safety and Health Act (“PE-OSHA”), N.J. Stat. Ann. § 34:6A-25 et seq. Brennan insists that the public has an interest in whether or not its public safety laws are being violated. We agree.
The dangers of asbestos are well established and require no reaffirmation or additional proof here.[11] Given the well documented danger of asbestos in the workplace, we are not impressed by the “limitation” that “only” firefighters may be harmed by the presence of asbestos in the firestation where Brennan worked. Those firefighters were, after all, public employees committed to protecting the citizens of the Township from the danger of fires. Residents of the Township clearly had an interest in knowing that their tax dollars were being spent on an asbestos contaminated firestation that endangered the health and lives of its firefighters. This is such a basic proposition that we need not belabor the point. Quite simply, the statements regarding exposure of public employees to hazards such as asbestos can be “fairly considered as relating to [a] matter of ... concern to the community,” Baldassare, 250 F.3d at 195 (citation omitted). Therefore, the district court erred by finding that Brennan’s complaints about asbestos to the State Department of Labor and Health were not protected speech about a matter of public concern.[12]
*364 This conclusion does not, however, end our inquiry. Nonconstitutional error in a civil suit “may be deemed harmless if it is highly probable that the error did not affect the outcome of the case.” West v. Philadelphia Electric Co., 45 F.3d 744, 752 (3d Cir.1995) (citation and internal quotations omitted); see also Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 329 (3d Cir.2002) (“In a civil case, a[ ] [nonconstitutional] error is harmless if it is highly probable that it did not affect the party’s substantial rights.”) (citation omitted). Therefore, we must consider the impact, if any, this error may have had on Brennan’s claim.
The district court’s erroneous conclusion that the presence of asbestos in the Township firestation did not concern the public prevented the jury from knowing that Brennan’s asbestos related complaints were protected under the First Amendment. However, the jury was informed that Brennan’s speech in opposition to the closing of the two fire stations and the replacement of the Fire Sub-Code Official with a civilian was protected by the First Amendment. The jury found in Brennan’s favor and against all of the defendants on his First Amendment retaliation claim. Inasmuch as Brennan prevailed on the First Amendment retaliation claim despite the district court’s erroneous view of the public importance of Brennan’s asbestos complaints, we conclude that the error did not affect the outcome of Brennan’s ease. It may, however, have had an effect on the amount of damages the jury awarded if Brennan is entitled to an award of damages on his retaliation claim. However, for reasons we explain below, we do not believe that Brennan proved compensatory damages or that the district court abused its discretion in granting judgment as a matter of law on the jury’s award of punitive damages. Therefore, we conclude that the error was harmless.
2. Complaints about Protective Gear and Uniforms.
Brennan also argues that his complaint to the New Jersey Department of Labor regarding the lack of adequate protective uniforms relates to a matter of public concern because both federal law and the New Jersey Administrative Code mandate protective fire gear for firefighters. Although this argument has superficial appeal, the Township and Saage point out that Brennan’s speech did not address any safety issues regarding uniforms and protective gear. They argue that instead, Brennan voiced concern that the Teaneck Fire Department was not receiving the uniforms and protective clothing quickly enough. Brennan does not now claim otherwise nor does he dispute that the Township ultimately bought protective uniforms made from a fire-resistant material called “Nomex.” Those uniforms were even safer than the 100% cotton uniforms that he had been urging the Township to buy. Accordingly, given the context of Brennan’s complaint that protective uniforms were not being purchased quickly enough, we agree that it did not implicate the public concern necessary for First Amendment protection.[13]
*365 3. Brennan’s First Amendment Petition Clause Activities.
Brennan also argues that the Petition Clause of the First Amendment protects each of the following activities: (1) his complaints about the asbestos and the uniforms; (2) filing this lawsuit; and (3) filing an unfair labor practice charge with the NJPERC regarding the payroll status of firefighters on IOD leave.[14] He argues that each of these activities and related expressions is protected by his First Amendment right to petition the government. According to Brennan, the district court therefore erred by requiring him to establish that these activities related to matters of public concern, as that is not a condition precedent to protection from retaliation under the Petition Clause.
It is undisputed that filing lawsuits and grievances under a collective bargaining agreement implicate the Petition Clause of the First Amendment. San Filippo v. Bongiovanni, 30 F.3d 424, 434-35 (3d Cir.1994). Although a plaintiff alleging retaliation for protected speech under § 1983 must ordinarily establish that his/ her speech was a matter of public concern to qualify for the protections of the First Amendment’s guarantee of free expression, the same is not true where the speech itself constitutes the plaintiffs lawsuit. Id. at 434-43. On the contrary, a plaintiff need only show that his/her lawsuit was not frivolous in order to make out a prima facie claim for retaliation under the Petition Clause. Id.; see also id. at 443 (“The mere act of filing a non-sham petition is not a constitutionally permissible ground for discharge of a public employee.”).
We reject Brennan’s Petition Clause argument not because the district court required a showing of a “public concern” analysis, but because Brennan never made a Petition Clause argument in the district court in the first place. His only First Amendment claim there was based on the Speech and Association Clauses. His complaint alleged: “[t]he defendants’ acts and conduct described herein deprived plaintiff of his rights to free speech and free association under the First Amendment, including but not limited to the right to speak on matters of public concern, in violation of the First Amendment to the United States Constitution and 42 U.S.C. § 1983.” Amended Compl. ¶ 45 (emphasis added). There was no reference to the Petition Clause.
Brennan nevertheless insists that he did raise his Petition Clause argument in the district court. He supports this by citing to his Brief in Opposition to Defendants’ Motion for Summary Judgment at page 24. There, he cited San Filippo “for the proposition that a lawsuit, grievance or administrative proceeding is protected speech even if it ‘only touches on matters of private concern,’ based on ‘the First Amendment right to petition the government for a redress of grievances.’ ” Brennan’s Reply Br. as Cross-Appellant, at 1-2. In his view, “[t]his argument, and all of the subsequent references to it, more than adequately raised this issue in the District *366 Court, and therefore preserve it for appeal.” Id. at 2. We disagree.
The issue is not whether a sufficiently clairvoyant jurist would have known that a particular argument was emanating from the ethers of briefs filed in the district court. “[T]he crucial question regarding waiver is whether [Brennan] presented the argument with sufficient specificity to alert the district court.” Keenan v. City of Philadelphia, 983 F.2d 459, 471 (3d Cir. 1993). His fleeting reference to San Fi-lippo in a brief in opposition to his opposing parties’ summary judgment motion is clearly not sufficient to inform the district court that Brennan was claiming a right to affirmative relief under the Petition Clause, separate and apart from his free speech and association claim. Accordingly, we conclude that Brennan has waived any argument he may have had to base his § 1983 claim on a violation of the Petition Clause.
4.Alleged Retaliatory Acts.
Brennan claims that each of the following retaliatory acts entitle him to relief in addition to the relief he claims results from his various job suspensions:
1. Norton refused to recommend that the Township Council extend Brennan’s IOD leave;
2. Bauer transferred Brennan out of Headquarters to Station 2;
3. Palazzola told Lt. Schroeder that he (Palazzola) would transfer Brennan and make his life miserable after Brennan objected to closing firehouses and replacing the Fire Sub-Code Official;
4. Brennan was transferred to Station 2 after returning from disability leave in February 1995, and Bauer assigned him to ten hour watch duties;[15]
5. O’Neill told Smith and others that Brennan was on medication that caused psychotic behavior;
6. O’Neill stopped using Brennan’s title and refused to capitalize his name in mem-oranda O’Neill wrote;
7. Immediately after his first report about asbestos, Palazzola required Brennan to “pull hose,” which Brennan says is a menial labor-intensive task;
8. Palazzola cited Brennan for “conduct unbecoming” charges after Brennan was involved in punching a mattress;
9. Brennan was served with a Preliminary Notice of Disciplinary Action, signed by Saage, recommending Brennan’s discharge from the Fire Department after Saage was served with the complaint he filed in the district court;
10. Brennan was subjected to daily hostilities after he filed the complaint. These included being the only firefighter without a locker; a sticker reading “Department Asshole” was placed on his helmet; the TV was reprogrammed with homophobic remarks referring to him; his personal belongings were stolen; and Norton reportedly laughed at Brennan when Brennan reported certain incidents to him; and
11. After a local newspaper referred to Brennan as a “whistleblower,” dozens of whistles were hung in a tree outside his firehouse. There was no investigation, and supervisors allowed the whistles to remain there for months.
The Township and Saage argue in part that these actions were too petty to constitute an actionable constitutional violation. We agree that some of the alleged wrongs do not rise to the level *367 of actionable conduct by a public employee given the record before us.[16] “Determining whether a plaintiffs First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts.” Suarez Corp. Industries v. McGraw, 202 F.3d 676, 686 (4th Cir.2000) (emphasis added). Consequently, “[t]o properly balance these interests, courts have required that the nature of the retaliatory acts committed by a public employer be more than de minimis or trivial.” Id. A public employer “adversely affects an employee’s First Amendment rights when it refuses to rehire an employee because of the exercise of those rights or when it makes decisions, which relate to promotion, transfer, recall and hiring, based on the exercise of an employee’s First Amendment rights.” Id. (citations and internal quotations omitted). “On the other hand, courts have declined to find that an employer’s actions have adversely affected an employee’s exercise of his First Amendment rights where the employer’s alleged retaliatory acts were criticism, false accusations, or verbal reprimands.” Id. (citations omitted).
A number of Brennan’s allegations do not rise to the level of substantive constitutional violations — e.g., Brennan’s attempt to forge constitutional violations from allegations that O’Neill stopped using Brennan’s title and did not capitalize his name — because, even if true, they are de minimis. Nevertheless, other allegations of retaliation clearly do rise to the level of a violation of Brennan’s First Amendment rights viewed in context with the course of conduct alleged, or taken individually. For example, Brennan’s allegation that he was taken off the payroll in December 1994 and given 2-day, 21-day and 63-day suspensions would obviously support a cause of action for illegal retaliation under § 1983.
However, even though some of the allegations of retaliation could rise to the level of a First Amendment violation, it is hard from this record to determine which defendant or defendants were responsible for actionable retaliation with sufficient precision to assess liability against any particular defendant or defendants. For example, there is no way of knowing if any of the named defendants were responsible for placing the whistles in the trees, or placing the objectionable sticker on Brennan’s helmet. Moreover, even where responsibility can be established, Brennan’s claim for relief still fails because he cannot establish the necessary nexus between protected conduct and alleged retaliation.
5. Causal Connection Between Alleged Retaliatory Conduct and Brennan’s Protected Speech.
As noted above, once a public employee demonstrates that his/her speech pertains to a matter of public concern of sufficient gravity to outweigh the state’s interest as employer, the employee must “then show that the protected activity was a substantial or motivating factor in the alleged retaliatory action.” Baldassare, 250 F.3d at 195. Brennan’s allegations reflect a myopic interpretation of events wherein retaliatory motives permeated the defendants’ every move. So viewed, such seemingly innocuous occurrences as not capital *368 izing Brennan’s name in various written memos become a basis to seek money damages in federal court. Not unexpectedly, the defendants argue that Brennan failed to produce direct or circumstantial evidence to support a reasonable inference that the alleged retaliatory conduct was the result of Brennan’s protected speech. In order to resolve this, we must examine the allegations of retaliatory conduct by each of the defendants.
(a). Fire Chief Norton.
Brennan asserted four retaliation claims against Norton. First, Brennan claimed that on July 12, 1995, Norton retaliated against him for his protected speech by denying Brennan’s request to have outsta-tioned firefighters attend union meetings at headquarters. Brennan challenged this action in an unfair labor practice charge he filed with the NJPERC. However, there was a significant time lag between Brennan’s protected expression and Norton’s alleged retaliation. Brennan protested closing the fire stations in July 1994 and he protested the Fire Sub-Code Official proposal in October 1994. Norton’s alleged retaliation occurred in July 1995.
The causation required to establish a claim under § 1983 is identical to that required under Title VII. Accordingly, cases addressing a private employer’s alleged retaliation for protected activity under Title VII is helpful to our analysis here. In Abramson v. William Paterson College, 260 F.3d 265, 288 (3d Cir.2001), we focused on the timing of the retaliation and evidence of continuing animosity. We concluded that a significant delay between the expressive activity and the retaliation would not preclude finding the required nexus where there is evidence of continuing hostility to connect events that would not otherwise appear to be related to each other. Id. Although the nine month gap here between expression and alleged retaliation is not, by itself, sufficient to preclude an inference of causation, there is nothing other than Brennan’s claim of causation to connect the two.
Moreover, we are at a loss to understand how Norton’s refusal to allow a class of firefighters to attend meetings harmed Brennan, as he was not even a member of the affected class. Any possible harm was inflicted upon the outstationed firefighters or the union, not Brennan, and he has not produced evidence to show how that refusal could reasonably be equated with retaliation against him.
More importantly, however, it appears that Norton’s action was not motivated by animus against Brennan at all. The record establishes that Brennan eventually withdrew his unfair labor practice charge after entering into a settlement agreement requiring outstationed firefighters to first arrange for other firefighters to cover their shifts before leaving duty stations to attend union meetings. In that settlement agreement, Brennan did not dispute that the need for replacements justified Norton’s denial of Brennan’s request. We believe this fatally undermines Brennan’s attempt to brand Norton’s action as retaliation. The only logical inference arising from the agreement that Brennan himself freely entered into is that Norton’s refusal to allow outstationed firefighters to leave duty stations was motivated by a concern for maintaining proper coverage in those stations, not by Norton’s animosity toward Brennan.
Brennan also alleged that in or about December 1994, Norton refused to allow him to use a photocopier for union purposes. However, Brennan does not dispute the Township’s and Saage’s claim that he never even asked Norton to use the photocopier for union purposes. Accordingly, that allegation is frivolous.
*369 Brennan’s third allegation against Norton is that Norton issued Brennan an unsigned ID card in May 1995. Norton denies this, but that is irrelevant because Brennan does not bother to explain the significance of an unsigned ID card. Moreover, even if Norton had issued Brennan an unsigned ID card in retaliation for Brennan’s protected activities, nothing on this record would allow us to conclude that the “injury” was sufficient to support recovery under § 1983. See Suarez, 202 F.3d at 685-86.
Brennan’s final claim against Norton arises from Brennan reporting for work out of uniform on May 24, 1996. Norton charged Brennan with conduct unbecoming a firefighter and suspended him for 2 days. However, without more, this incident merely shows that Norton was enforcing the rules of the workplace. The Personnel Department subsequently upheld the suspension and concluded that it was justified. Absent evidence that other firefighters had similarly violated the dress requirements without being disciplined, the required nexus between Brennan’s dismissal and his expression is obviously missing. Moreover, this charge and the resulting dismissal came nearly a year and a half after Brennan’s expression. This record does not support Brennan’s apparent belief that everything that happened to him in the intervening year and a half was motivated by an intent to retaliate for his protected speech.
Accordingly, we agree with the district court’s conclusion that Brennan failed to prove any claim against Norton.
(b). Deputy Chief Bauer.
When Brennan called in sick on May 25, 1996, Bauer asked that Brennan provide him with a doctor’s note to justify the absence. This is the only retaliatory action Brennan presents against Bauer. However, Brennan has not shown how something so basic as requesting a doctor’s note from an employee who used sick leave establishes improper retaliatory conduct under § 1983. We realize, of course, that this kind of conduct could be retaliatory if a supervisor makes such routine requests of some employees and not others, but there is no evidence of such disparate treatment in response to protected expression here. An employer can certainly require an employee to document a claimed absence due to illness. Moreover, once again, this occurred nearly a year and a half after Brennan’s protected expression. Given that gap, we conclude that the allegation against Bauer is not substantive.
(c). Captain O’Neill.
Brennan asserted two retaliation claims against O’Neill. First, he claimed that O’Neill told Lt. Montgomery and others that Brennan was taking medication that caused psychotic behavior. O’Neill does not dispute that in March of 1995 he told Montgomery that Brennan was taking medication that had possible side effects of euphoria, insomnia, and possible psychotic behavior. However, Brennan was actually taking such medication, and we do not see how O’Neill’s disclosure of that information to supervisors responsible for firefighters’ safety establishes retaliation. Moreover, even if this disclosure was motivated by anger at Brennan’s expression, Brennan has not demonstrated any compensable injury under § 1983. See Suarez, 202 F.3d at 685 (“1983 retaliation plaintiff must demonstrate that the defendant’s actions had some adverse impact on the exercise of the plaintiffs constitutional rights.”).
Second, Brennan claimed that O’Neill revoked the extra year of seniority that Brennan had earned as a result of his prior employment with another fire de *370 partment. O’Neill denies he ever did this. However, even if we assume arguendo that the seniority was revoked, Brennan’s cause is still not advanced because Brennan has not established the date of the alleged revocation. Absent this chronology or similar’ circumstances to allow a reasonable fact finder to tie the revocation to Brennan’s First Amendment activities, the nexus necessary to establish a retaliatory motive is simply lacking.
(d). Deputy Chief Palazzola.
Brennan charged Deputy Chief Palazzola with four acts of retaliation. First, he alleged that in April or May of 1995, Palazzola issued used gloves to him while other firefighters received new ones. However, Brennan admitted that he did not know whether better gloves were available and he did not claim that he suffered even the slightest harm by wearing used gloves as opposed to new ones. Moreover, this conduct is so trivial that even if Palaz-zola’s motives were colored by retaliatory animus, we would be hard pressed to conclude that this act is of sufficient gravity to support liability under § 1983. See Suarez, 202 F.3d at 685-86.[17]
Second, in November 1995, Brennan complained that the Township had not provided him with suspenders for his bunker pants. Brennan claims that Palaz-zola responded to Brennan’s complaints about suspenders by telling someone that Brennan would be transferred back to Headquarters if he did not stop complaining and that Palazzola would make life miserable for him. However, Brennan admits that Palazzola did not say anything in his presence or within the range of his hearing. In addition, Brennan is unable to identify the person to whom Palazzola allegedly made the statements. Accordingly, his proof as to this allegation amounts to nothing more than his unsupported allegation. Moreover, even if Brennan could establish that Palazzola threatened to transfer him after he complained about suspenders, we would once again have to evaluate this claim in light of the teachings of Suarez. Given that standard, Brennan would be hard-pressed to establish that Palazzola was motivated by Brennan’s protected speech and was not simply responding to complaints about suspenders and used gloves.
Brennan’s third allegation against Palaz-zola appears, at first glance, to be more substantive. Brennan claims that in February of 1996, Palazzola responded to Brennan’s complaints about asbestos in the firestation by saying that Brennan knew what would happen to him if he made that a safety issue. According to Brennan, three days later he was transferred to Station 3 in violation of his seniority. On March 12, 1996, Brennan complained to the Personnel Department he believed that Palazzola’s statement and his subsequent transfer were in retaliation for his union activities and safety hazard complaints, which included complaints about asbestos in the firestation.
Earlier, we held that the district court erred by finding that Brennan’s complaints about asbestos in the firestation were not protected speech about a matter of public concern. Therefore, if Palazzola had transferred Brennan from Station 2 to Station 3 in violation of his seniority because of his complaints about asbestos, that could establish retaliation for engag *371 ing in protected public concern speech.[18] However, Brennan has produced no credible evidence that Palazzola was responsible for the transfer. He claims that the defendants transferred him and that claim is based on the belief of Brennan’s then superior, Lt. Schroeder, that the defendants transferred Brennan because of his complaints about asbestos. Yet, based on this evidence, we are unable to determine if Palazzola was the fire department official who retaliated against Brennan because of his complaints about asbestos.[19]
Brennan’s fourth, and last, claim against Palazzola involved the mattress punching incident. As noted above, on Sunday, August 11, 1996, Palazzola called Brennan while Brennan was home on sick leave. Palazzola informed Brennan that he was being charged with conduct unbecoming a public employee because Brennan had used a dormitory mattress as a punching bag. Palazzola also allegedly told Brennan that he could not return to work without a doctor’s note. Brennan claimed that he used the mattress as a punching bag to relieve stress after he learned that the FMBA had dropped his grievance regarding overtime. Moreover, Brennan alleged that other firefighters who used a mattress as a punching bag were not disciplined.
Brennan’s claim is, of course, that Palazzola charged him with conduct unbecoming a public employee in retaliation for engaging in protected activities. However, he produced no credible evidence to support that claim. While he does allege that other firefighters who used a mattress as a punching bag were not disciplined, he does not give the details of those incidents. Thus, we do not know if those other instances were similar to Brennan’s or not. In our view, this alleged instance of retaliation is nothing more than a straightforward disciplinary proceeding. Brennan does not dispute the defendants’ recitation that on August 9, 1996, Brennan was engaged in a heated public argument with another firefighter; that he was punching a mattress and screaming “they had sold me out;” that when Palazzola spoke to him, Brennan appeared distraught; and that Palazzola, as a result of the incident, charged Brennan with conduct unbecoming a firefighter. Subsequently, Brennan took 2 sick days, Palazzola’s charge was upheld and Brennan was suspended for 5 days. On administrative appeal, the Personnel Department affirmed the charge, but reduced the suspension to 2 dáys.
Although the subsequent action of the Personnel Department affirming Palazzo-la’s action does not negate Brennan’s federal claim, it does corroborate the defen *372 dants’ contention that the personnel action was warranted and not retaliatory. Moreover, the twenty-one month time lapse between Brennan’s protected activities and Palazzola’s charge is too remote to support an inference of retaliation.
(e). Unspecified Defendants.
Brennan also alleged improper retaliatory acts by unspecified defendants: including being listed AWOL in March 1995 for failure to attend a workers’ compensation doctor’s evaluation; denial of his request for leave with substitute in June 1996; his assignment in August 1996 by Lt. Montgomery (who is not named as a defendant) to watch a training video about a firefighter who killed his superiors; his assignments to 10 hour housewatches; a denial of his request for either a Thanksgiving 1994 or Christmas 1995 holiday; the “Department Asshole” sticker; and the whistles in the tree incident.
As noted above, the difficulty with each of these allegations is that Brennan does not assign responsibility for them. He merely makes' a blanket claim that the “defendants” took various actions against him with no further attempt to fix responsibility, and the record does not contain sufficient information to allow a trier of fact to attach liability for a given act of alleged retaliation. Thus, Brennan’s failure to identify the defendant or defendants responsible for these alleged incidents dooms these claims of retaliation, even assuming that they would otherwise be actionable.
As noted, the jury found that Norton, Bauer, Palazzola and O’Neill retaliated against Brennan for engaging in protected speech. However, the district court granted each of those defendants judgment as a matter of law in post-trial proceedings.[20] The court reasoned that there was “no evidence that plaintiffs exercise of his free speech rights was a substantial or motivating factor in any action they took with respect to plaintiff.” BA-43. We agree. We earlier commented on the extent to which Brennan’s myopic view defined everything that happened to him after he spoke out about the closing of the fire stations and the Fire Sub-Code Official to be a direct result of his protected expression. This includes actions that might fairly be categorized as retaliatory and harmful as well as such trivial matters as his name not being capitalized in memos. However, to the extent that actions of Norton, Bauer, Palazzola or O’Neill could actually rise to the level of a First Amend *373 ment violation, Brennan has not produced sufficient evidence to allow a reasonable jury to conclude that those defendants’ actions were retaliatory. That nexus arises only from Brennan’s allegations, rather than proof that he produced.
(f). Township Manager Saage.
Brennan asserted two retaliation claims against Saage. The first centered on Saage’s charging Brennan with conduct unbecoming a public employee for electioneering on June 5, 1996, and then imposing a 21-day suspension as a sanction on September 4, 1996. On administrative appeal, the Personnel Department dismissed that charge.
The second centered on a September 13, 1996 charge Saage brought against Brennan for conduct unbecoming a public employee. This resulted from Brennan presenting a forged doctor’s note, abusing sick leave, and interfering with the public bidding process. Saage suspended Brennan on those charges on November 8,1996 for 63 days. The Personnel Department reduced the suspension for forgery to 10 days and dismissed the other charges on administrative appeal.
The jury agreed that Saage retaliated for Brennan’s exercise of his First Amendment rights, and the district court denied Saage’s motion for judgment as a matter of law. Saage now contends that the district court erred by not granting him judgment as a matter of law on that claim because Brennan failed to show any causal connection between protected speech in July and November of 1994 and Saage’s disciplinary actions almost 2 years later.
Saage argues that there was overwhelming evidence that a majority of the firefighters and the Township residents opposed his recommendations to close the two fire stations and replace the Fire Sub-Code official. In fact, Saage points out that the opposition even included all of the other individual defendants. According to Saage, the evidence shows that Brennan failed to distinguish himself from all of the other critics of that proposal and it is therefore unreasonable to conclude that Saage was somehow able to single out Brennan and punish him for his expression. Saage concedes, in its order denying Saage’s motion for judgment as a matter of law, that the district court credited Brennan’s argument that he was an outspoken leader of the opposition to Saage’s recommendation. However, according to Saage, that finding is not enough to conclude that Saage singled Brennan out, and there was no evidence that Saage or the Township were aware of Brennan’s protected expression as distinguished from everyone else’s. Saage points to his testimony that he never even knew that Brennan posted signs protesting Saage’s recommendations or that Brennan was even involved in a leafleting campaign. Moreover, Saage claims that there was no evidence that the Council was either aware of Brennan’s signs or that Brennan was responsible for a public service announcement advocating reopening the two fire stations Saage had closed. Saage contends Brennan therefore failed to produce evidence that his protected activities were a substantial or motivating factor in Saage’s disciplinary charges against Brennan.
The district court concluded that this was a close call. However, the court found that the evidence was sufficient to sustain the jury’s verdict. The court wrote: “[Tjhere is enough evidence (barely enough) for the jury to have concluded that certain of ... Saage’s actions with respect to [Brennan] were motivated in part by [his] disapproval of [Brennan’s] actions in opposition to closing two fire stations and replacing the Fire Sub-Code *374 Official.” Dist. Ct. Opn. on Motions for Judgment as a Matter of Law, at 14.
Closing the two fire stations and replacing the Fire Sub-Code Official with someone other than a professional firefighter were both Saage’s ideas. Both proposals had to be approved by the Township Council and both proposals generated considerable opposition by the Fire Department as well as the Township residents. Although Saage claims that he was unaware of Brennan’s role in that opposition, a reasonable jury could have found that Brennan was indeed a leader and that his opposition was so extensive that Saage must have known of Brennan’s role.[21] Thus, the fact that the district court found only “barely enough” evidence to support Brennan’s claim against Saage is still sufficient to support the jury’s verdict. “Barely enough” evidence is still “enough.”
There is also evidence that Saage disapproved of Fire Department employees circumventing him and going directly to the Mayor and the Township Council as Brennan did. Chief Norton testified that Saage even reprimanded him for writing a letter to the Mayor and Township Council opposing Saage’s Fire Sub-Code Official proposal. In fact, Saage even testified that he considered a firefighter named Hillermier to have been insubordinate because Hiller-mier made a presentation to the Mayor and Township Council opposing Saage’s proposals to close the two firestations. A jury could therefore have easily concluded that Saage took a dim view of Brennan’s opposition to Saage’s proposals. In fact, in December of 1994, Saage even warned Chief Norton against writing a letter to the Township Council recommending that Brennan’s IOD leave be continued beyond the 30-day period.
Given that evidence, the fact that Saage brought two charges against Brennan and then suspended him after concluding that those charges were meritorious, a jury could have reasonably attributed retaliatory motives to Saage’s actions toward Brennan. Because those actions included a job suspension, Brennan established the requisite harm. There was therefore sufficient evidence to find that Brennan’s protected speech was a substantial or motivating factor in Saage’s conduct toward Brennan, and that that conduct was retaliatory. Accordingly, the district court did not err in denying Saage’s motion for judgment as a matter of law.
(g). The Township.
As recited, the jury found in favor of Brennan and against the Township, and the district court thereafter denied the Township’s motion for judgment as a matter of law. However, Brennan’s theory of liability against the Township is not readily apparent to us because he does not articulate what the Township’s retaliatory acts were. Rather, he leaves us to presume that the alleged retaliation consisted of the Council’s two votes in January 1995 denying Brennan’s request for an extension of his 30-day IOD leave. However, Saage was the only non-firefighter Township official sued by Brennan. Brennan did not sue Mayor Ostrow or any of the individual Township Council members. Moreover, Brennan produced no evidence that either the Mayor or the Council members were even aware of his protected expression. In addition, Brennan’s initial request for an extension of IOD leave was unanimously denied by the Council on January 3, 1995. It is important to note that another firefighter named “Pointer,” was also denied extended IOD leave at the same time. The Township explained that the denials *375 were motivated by budgetary concerns and the nature of both Brennan’s and Pointer’s injuries. Brennan does not dispute that explanation.
Brennan wrote a letter to the Mayor and the Council on January 13, 1995 because he was not happy about the denial of his requested leave extension. However, that letter did not include matters of public concern. It only dealt with the circumstances of his own leave request and did not suggest that Saage or anyone else was involved in denying Brennan the extension of IOD leave he requested.
Brennan also addressed the Council at a regularly scheduled meeting on January 17, 1995 and requested that his IOD leave be extended. The Council voted 4 to 2 with one abstention to deny Brennan’s request. However, there is nothing in the record of that meeting or the circumstances surrounding it to suggest that Council members were aware of Brennan’s protected speech. Moreover, as we have just noted, Brennan’s claim that he was the only firefighter whose request for extended IOD leave was denied is belied by the fact that Pointer’s request was also denied.
More importantly, Brennan’s allegation of retaliatory motive is defeated by his own conduct. As we have already noted, on May 30, 1995, Brennan filed an unfair labor practice charge with the NJPERC. There, he alleged that the Township Council’s denial of his request for extended IOD leave was “pay back” for an unfair labor practice charge that he had filed with the NJPERC regarding outstationed firefighters attending meetings at headquarters as we have discussed above. He now alleges that the denial was motivated by “pay back” for his First Amendment expression. However, his attempt to change horses at this late date is less than convincing. Clearly, by filing this unfair labor practice charge against the Township Council, Brennan’s claim that the Township Council denied him extended IOD leave in retaliation for engaging in protected activities is severely undermined.[22]
Most importantly, Brennan’s position ignores the fact that the Township cannot be held vicariously liable in a suit under § 1983. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality can be sued directly under § 1983 if it is alleged to have caused a constitutional tort through a policy, ordinance, regulation or officially adopted decision that has been promulgated by the municipality’s officers. Liability also attaches for a municipality’s constitutional violations resulting from governmental custom even though such custom has not been formally approved via the official decision making channels. Id. at 690-91, 98 S.Ct. 2018. However, Brennan does not attempt to base the Township’s liability upon a policy or custom.
It is also true that, under Monell, municipal liability may still exist where authorized policymakers approve a subordinate’s decision and the basis for it. See, City of St. Louis v. Praprotnik, 485 U.S. 112, 117, 108 S.Ct. 915, 99 L.Ed.2d 107 *376 (1988); see also, Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990). Here, however, Brennan did not establish any basis for the conclusion that the May- or or the Town Council approved of the retaliatory motivation behind Saage’s actions.
The only other possible source of liability against the Township under § 1983 is if “an unconstitutional policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government’s business.” City of St. Louis v. Praprotnik, 485 U.S. at 123, 108 S.Ct. 915; see also Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). In Pembaur, the Court stated:
[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body — whether or not that body had taken similar action in the past or intended to do so in the future —• because even a single decision by such a body unquestionably constitutes an act of official government policy.
475 U.S. at 123, 106 S.Ct. 960 (citations omitted). Under this theory, the jury must first determine if an individual public employee is a policy-maker. Id. at 123, 126, 106 S.Ct. 960. However, if a municipal employee’s decision is subject to review, even discretionary review, it is not final and that employee is therefore not a policymaker for purposes of imposing municipal liability under § 1983. Id. at 127-30, 106 S.Ct. 960.
In denying judgment as a matter of law to the Township, the district court concluded that Saage “occupied a sufficiently high policy-making role[] to create liability on the Township’s part.” Dist. Ct. Opn. at 19. However, it is undisputed that Saage’s allegedly retaliatory actions were subject to review by a number of higher authorities including the Council, the Mayor, the NJPERC or the State Department of Personnel. See New Jersey Charter/Administrative Code, §§ 2.2.3, 2.3.1, 2.3.2, 2.2.7 and 2:11-4 to -6; Civil Service Law, N.J. Stat. Ann. §§ 11A:2-6,:2 11,:2-14 and:2-16; Employer-Employee Relations Act, N.J. Stat. Ann. §§ 34:13A-5.2 and:13A-5.4. Brennan availed himself of this very review process by appealing Saage’s decisions to the Personnel Department both times that Saage disciplined him. Accordingly, the Township cannot be liable under § 1983 as a matter of law, and the district court therefore erred in denying the Township’s motion for judgment as a matter of law.
(h). Punitive Damages.
The jury concluded that Saage retaliated against Brennan for the latter’s exercise of First Amendment rights and awarded Brennan $150,000 in punitive damages in addition to compensatory damages. The standard for awarding punitive damages under § 1983 has been summarized as follows:
a jury may ... assess punitive damages ... under § 1983 when the defendant’s conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.
Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (emphasis added). In Savarese v. Agriss, 883 F.2d 1194 (3d Cir.1989), we noted that this standard is disjunctive and not conjunctive. We explained:
[F]or a plaintiff in a section 1983 case to qualify for a punitive award, the defendant’s conduct must be, at a minimum, *377 reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant’s action need not necessarily meet this higher standard.
Id. at 1204.
The district court denied Saage judgment as a matter of law as to liability, but granted him judgment as a matter of law as to the punitive damages award against him. The court explained:
To award punitive damages it must be found that a defendant engaged in malicious conduct or acted in wanton and willful disregard of another’s rights. Malicious conduct is intentional wrongdoing in the sense of an evil-minded act. Saage’s conduct in the present case cannot be found to have risen to the level of that wrongdoing.
Dist. Ct. Op. at 19. The court concluded that Saage’s conduct, viz., advising Norton not to recommend Brennan’s request for an IOD extension and his handling of the charges against Brennan, “cannot be found to have risen to that level of wrongdoing ... deserving of punitive damages.” Id.
Brennan argues that the district court’s ruling is erroneous because evil-minded conduct is not a condition precedent to recovering punitive damages under § 1983. He claims the district court therefore subjected him to a higher burden than required by Supreme Court precedent. According to Brennan, all that a § 1983 plaintiff need show to recover punitive damages is that the defendant acted with a “reckless” or “callous indifference.”
We need not decide this precise issue because Saage’s conduct does not even satisfy the less demanding standard Brennan urges upon us.[23] Brennan’s theory is that Saage was the omnipresent, driving force behind everything negative that happened to him after he first expressed opposition to Saage’s policies or spoke out against those in power in the Fire Department or their policies. Brennan argues that “Saage orchestrated a series of unwarranted disciplinary actions against Brennan, among a variety of forms of harassment and retaliation, both directly and through Norton, Bauer, Palazzola and O’Neill. In other words, [Saage] abused his power and control, directed others to further that unlawful purpose, and rewarded them for their participation.” Brennan’s Br. as Appel-lee/Cross-Appellant, at 51.
However, the conspiratorial picture Brennan paints is not consistent with the record. He has produced no evidence that Saage orchestrated a retaliatory campaign against him. Nor is there evidence that Norton, Bauer, Palazzola and O’Neill were Saage’s puppets or that Saage rewarded any of them for doing his bidding and retaliating against Brennan. We do agree with Brennan’s claim that this record supports a finding that Brennan’s protected speech was a motivating factor in Saage warning Norton against recommending an extension of Brennan’s IOD leave and subjecting Brennan to disciplinary charges and subsequent suspensions. However, the record does not support a finding that Saage acted out of either recklessness or callousness. Indeed, a contrary conclusion would mean that any finding of retaliatory motive would automatically support punitive damages. Even accepting Brennan’s formulation of the correct standard for punitive damages, it is clear under the Court’s holding in Smith v. Wade that punitive damages require more than the *378 retaliatory motive itself. Although we do not condone Saage’s conduct, we cannot conclude that it rises to the level required for punitive damages. Therefore, we hold that the district court properly granted judgment as a matter of law to Saage on the punitive damage award.[24]
(i). Motion for New Trial, or, in the alternative, for Remittitur.
The Township and Saage argue that the district court erred by denying their motion for a new trial based on their claim that the jury’s verdict was against the weight of the evidence. A new trial may be granted even when judgment n.o.v. is inappropriate. Roebuck v. Drexel University, 852 F.2d 715, 735 (3d Cir. 1988). However, a new trial should be granted only when the verdict is contrary to the weight of the evidence or when a miscarriage of justice would result if the verdict were to stand. Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir.1991). We review the district court’s ruling on a motion for a new trial for abuse of discretion. Roebuck v. Drexel University, 852 F.2d at 735 (“The authority to grant a new trial ... is confided almost exclusively to the exercise of discretion on the part of the trial court, and will be disturbed if the district court abused that discretion.”) (citation and internal quotations omitted). In light of our finding that the district court erred by not granting the Township’s motion for judgment as a matter of law, the Township’s argument that the district court erred by not granting a new trial is moot.
Although we agree with the district court’s assessment that Brennan’s evidence against Saage was “meager,” Dist. Ct. Op. at 18, we nonetheless agree that there was sufficient evidence to enable the jury to conclude that Brennan’s protected expression was a substantial or motivating factor in Saage’s warning Norton not to recommend extending Brennan’s IOD leave and in Saage’s bringing disciplinary charges against Brennan. Accordingly, the jury’s verdict against Saage does not constitute any miscarriage of justice.
We do, however, believe that the district court abused its discretion in deny *379 ing the requested remittitur.[25] The jury returned a verdict of $382,500 in compensatory damages against all of the defendants, but the district court granted judgment as a matter of law to Norton, Bauer, Palazzola ahd O’Neill. Therefore, it is impossible to determine whether the $382,500 includes damages that the jury attributed to some or all of the defendants the district court later found caused Brennan no harm.
B. Brennan’s Conscientious Employee Protection Act Claim.
Brennan’s complaint included a state law claim under New Jersey’s Conscientious Employee Protection Act, N.J. Stat. Ann. 34:19-1 to 19-8 (“CEPA”). CEPA provides, in relevant part:
An employer shall not take any retaliatory action against an employee because the employee does any of the following: a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law
(2) is fraudulent or criminal; or
• (3) is.incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
N.J. Stat. Ann. § 34:19-3. “Retaliatory action” includes discharge, suspension, demotion, or other adverse action involving an employee’s terms and conditions of employment. N.J. Stat. Ann. § 34:19-2(e). CEPA also provides that “[u]pon a violation of any of the provisions of this act, an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction.” N.J. Stat. Ann. § 34:19-5.
Tort actions brought under New Jersey law are governed by New Jersey’s Tort Claims Act (“TCA”) which applies to tort actions against public entities or their employees. The TCA has a 90-day notice requirement. N.J. Stat. Ann. § 59:8-3. Failure to satisfy the notice requirement of the TCA is an absolute bar to recovery against a public entity or its employees. Id. The district court dismissed Brennan’s CEPA retaliation claim because he failed to comply with the notice requirements of the TCA. Not unexpectedly, Brennan claims that was error. We agree.
Although the New Jersey Supreme Court has yet to decide whether the notice of claim requirement of the TCA applies to claims under the CEPA, our examination of relevant precedent convinces us that the TCA’s notice of claim requirement does not apply to actions brought under the CEPA.[26], [27] Even though *380 the CEPA has it origins in, and is apparently a codification of, “the preexisting common-law tort cause of action for ... retaliatory discharge,” the New Jersey Supreme Court has expressly found that the CEPA is a “civil rights statute.” Abbamont v. Piscataway Township Board of Education, 138 N.J. 405, 650 A.2d 958, 971 (1994). CEPA is a “whistleblower statute,” and “[i]ts purpose is to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.” Id. CEPA “is important to all New Jersey workers who are concerned about working in a safe environment with honest employers.” Id. at 964.
In Abbamont, the New Jersey Supreme Court held that the punitive damages prohibition contained in the TCA does not apply to CEPA claims brought against public entities because the TCA and the CEPA “involve different subject matter.” Id. at 970. As recited above, the New Jersey Supreme Court noted that CEPA is a civil rights statute designed to protect workers from unlawful intentional conduct, while the TCA is a statute designed to compensate tort victims from negligently inflicted injuries without imposing excessive financial burdens on the taxpaying public. Id. In addition, in Abbamont, the New Jersey Supreme Court noted that the CEPA and New Jersey’s Law Against Discrimination (“LAD”) were closely aligned in that both served broad societal goals. Id. at 970-71. Significantly, the New Jersey Supreme Court had already held in Fuchilla v. Layman, 109 N.J. 319, 537 A.2d 652 (1988), that the TCA’s notice provisions do not apply to the LAD. Finally, the New Jersey Supreme Court held in Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 735 A.2d 548 (1999), that the TCA’s bar against punitive damages does not apply to LAD claims against public entities.
Given the decisions in Fuchilla^ Abbamont and Cavuoti that the TCA’s punitive damage prohibitions do not apply to either LAD or CEPA claims against public entities, and that the TCA’s notice provisions do not apply to LAD claims against public entities, we believe that the New Jersey Supreme Court would hold that the TCA’s notice provisions do not apply to CEPA claims against public entities or their employees, and we so hold.[28] Accordingly, we conclude that the district court’s dismissal of Brennan’s CEPA claim for failure to comply with the TCA’s notice requirement was error.
IV. CONCLUSION
For all of the above reasons, we will affirm the district court’s grant of judgment as a matter of law to all of the individual defendants, except the Township Manager. As to the Township Manager, will affirm the denial of judgment as a *381 matter of law as to liability and will affirm judgment as a matter of law in his favor as to the punitive damages award. We will reverse the denial of the Township’s motion for judgment as a matter of law, and we will reverse the district court’s dismissal of Brennan’s state law claim under the Conscientious Employee Protection Act. Finally, we will affirm the district court’s denial of the Township’s and its Manager’s motions for a new trial, but will reverse the denial of remittitur.

. We will affirm the district court’s grant of judgment as a matter of law to all of the individual defendants except the Township Manager. With regard to the Township Manager, we will affirm the denial of judgment as a matter of law as to liability, but will affirm the grant of judgment as a matter of law on the punitive damages award. We will reverse the district court's denial of judgment as a matter of law to the Township, and the district court's dismissal of Brennan's state law claim under New Jersey’s Conscientious Employee Protection Act. Finally, we will affirm the district court's denial of the Township’s and its Manager’s motions for a new trial, but will reverse the denial of the remittitur.

. He also claims that at a subsequent examination on March 29, 1995, he was found unable to return to work, which, in his view, confirmed that he had been injured at the time he was declared AWOL.
Brennan also alleged that Captain O'Neill told firefighters that Brennan was on a "medication that causes psychotic behavior.”

. In addition, Brennan claimed that he did not receive any overtime pay for that day.

. This is a procedure whereby a firefighter arranges that another firefighter work in his/ her place. To obtain leave with substitute, a *357 firefighter must fill out a form, specifying the reasons for the request, and submit the form to his/her deputy chief.

. Subsequently, Brennan took 2 sick days, Palazzola’s charge was upheld and Brennan was suspended for 5 days. On administrative appeal, the Personnel Department affirmed the charge, but reduced the suspension to 2 days.

. Brennan does not identify who “McIntosh” is or the position McIntosh held.

. On May 7, 2001, Brennan’s former counsel filed a motion for attorney’s fees, which the district court has stayed pending appeal. Brennan was originally represented by counsel. The district court, by order dated May 10, 1999, permitted counsel to withdraw. Thereafter, Brennan proceeded pro se in the district court. However, he is represented by counsel in his appeal.

. Brennan does not argue that the district court’s dismissal of his state law claims, other than his CEPA claim, was error. The district court found that a provision of CEPA, more particularly N.J. Stat. Ann. § 34:19-8, which provides that "institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any contract, collective bargaining agreement, State law, rule or regulation or under the common law," barred his state law retaliation claim. The district court also found that a Notice of Claim provision in New Jersey’s Tort Claims Act, N.J. Stat. Ann. § 59:8-1 et seq., with which Brennan failed to comply barred his CEPA claim and his state law defamation and intentional and negligent infliction of emotional distress claims.

. In Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir.1997), we noted that "the expressive rights of public employees are not as expansive as those of citizens outside the public work force." Therefore, ‘To]nly a subset of speech that is protected for citizens is also protected for public employees: i.e., public concern speech." Id. However, even though the government may discharge a public employee for speech "not touching upon a matter of public concern ... the government as sovereign may not sanction the [public employee] when she engages in such speech as a citizen, outside the employment context.” Id. at 976 n. 3.

. "This court must make an independent constitutional judgment of the facts of the case as to whether the speech involved is constitutionally protected." Baldassare, 250 F.3d at 192 n. 1 (citation and internal quotations omitted).

. "Asbestos is the generic name for naturally occurring minerals which separate into fiber.” John P. Kincade, Issues in School Asbestos Hazard Abatement Litigation, 16 St. Mary’s LJ. 951, 953 (1985). It is a "toxic material,” whose "fibers break down into microscopic, friable particles that can be easily inhaled. Friable particles remaining in the lung often produce asbestos related diseases such as asbestosis, lung cancer, and mesothe-lioma.” Arthur A. Schulcz, Recovering Asbestos Abatement Costs, 10 Geo. Mason U.L.Rev. 451, 452-453 (1988).

.The Township and Saage also argue that Brennan never claimed in the district court that his complaints about asbestos violated the PEOSHA. Consequently, they contend that he has waived this particular argument and cannot make it here. See The Medical Protective Co. v. Watkins, 198 F.3d 100, 105 *364 n. 3 (3d Cir.1999). However, we do not believe that Brennan's alleged failure to argue in the district court that the presence of asbestos in the firestation violated state law or regulations constitutes a waiver. Brennan complained to the state authorities about the asbestos in the firestation and, as we have explained, that speech was protected public concern speech. Therefore, it is of no consequence to our analysis that he failed to argue in the district court that asbestos in the fires-tation violated state law.

. We do not, however, suggest that complaints about how quickly a public entity is purchasing protective equipment can never *365 rise to the level of public concern. We merely hold that such a concern is not established on this record, especially because the Township purchased uniforms that were superior to the uniforms Brennan was urging it to buy.

. The First Amendment states in relevant part:
Congress shall make no law ... abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.
U.S. Constitution, Amend. I.

. Brennan claims that ten hour watch duties violate department rules and regulations which limit non-disciplinary housewatch to four hours.

. We do not suggest, however, that some of these same wrongs can never support a cause of action under § 1983. Moreover, we think it important to note that a plaintiff may be able to establish liability under § 1983 based upon a continuing course of conduct even though some or all of the conduct complained of would be de minimis by itself or if viewed in isolation.

. We reiterate, however, that we are not suggesting that repeated incidents of what might otherwise be trivial "harassment” can never be actionable. The cumulative impact of retaliatory acts may become actionable even though the actions would be de minimis if considered in isolation.

. We assume for argument’s sake that a transfer that violates a public employee's seniority is an adverse employment action.

. Brennan also claims that Palazzola retalia-torily transferred him because of his union activities, but he does not bother to specify the nature of those activities. As a broad proposition, some union activity "presumably comes within the [First Amendment's] right to associate for expressive purposes.” Hotel and Restaurant Employees and Bartenders Int’l Union, Local 54 v. Read, 832 F.2d 263, 265 (3d Cir.1987) (citing Roberts v. United States Jaycees, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) ("[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social [and] economic ... ends.”)). If we take this broad proposition and then assume for argument's sake that Brennan's unspecified union activities constitute protected public concern speech, Brennan's claim that Palazzola transferred him in retaliation for those activities would fail for the same reason that his claim that he was transferred for complaining about asbestos fails, i.e., he has no credible proof that Palaz-zola was the fire department official responsible for his transfer.

. The standard of review on the district court’s grant of a motion for judgment as a matter of law is as follows:
We exercise plenary review of an order granting or denying a motion for judgment as a matter of law and apply the same standard as the district court. Such a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party. Thus, although the court draws all reasonable and logical inferences in the nonmovant's favor, we must affirm an order granting judgment as a matter of law if, upon review of the record, it is apparent that the verdict is not supported by legally sufficient evidence.
Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.1993) (citations and internal quotations omitted).

. Brennan’s activity included, after all, an appearance before the Township Council.

. Brennan does not claim that the grievance about the outstationed firefighters is protected public concern speech. Moreover, given our holding that Brennan did not present a Petition Clause claim in the district court, we need not determine whether filing a grievance with the NJPERC about the outstationed firefighters is a protected activity under the petition clause. Thus, the unfair labor practice charge is nothing more than a complaint about the employer-employee relationship. It is private speech not entitled to First Amendment Protection. United States v. National Treasury Employees Union, 513 U.S. 454, 466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).

. "Whether there is sufficient evidence to support a punitive damages award is a question of law which we review de novo.” Alexander v. Riga, 208 F.3d 419, 430 (3d Cir. 2000).

. We note that the district court indicated that it would adjust the award of punitive damages if we were to reverse it. The court opined that, in that event, it
would reduce the amount of the punitive damages award as grossly excessive. Among the factors that a jury must consider in making a punitive damages award are the offensiveness of the conduct and the amount needed, considering defendant's financial condition, to prevent future repetition. In the present case, there was no evidence of Saage's financial condition. He has been a municipal employee for most of his professional career, not earning a munificent salaiy. There is no indication whether he has acquired a large amount of assets or whether he owes money. Thus, there is no basis for an award of $150,000 against him. Were punitive damages to be awarded I would reduce the amount to $10,000 which would not be unduly harsh for a person living on the salary of a municipal employee and which would have a deterrent effect on one in such circumstances.
Dist. Ct. Op. at 19 (emphasis added). Brennan argues that the italicized portion of the district court’s statement improperly placed the burden on him to show Saage's ability to pay in order for him to recover punitive damages. Consequently, the district court committed error. However, Brennan reads far too much into this statement. The district court vacated the award of punitive damages against Saage, and we agree that it is not supported by the evidence. Moreover, the statement is merely an indication of how the court would rule if we were to reverse the district court's order vacating the punitive damages award. Accordingly, we will not address Brennan's argument that the district court improperly placed the burden of showing Saage’s ability to pay punitive damages on him. We do not believe the district court did that.

. We review the district court's denial of a remittitur for abuse of discretion. Dunn v. HOVIC, 1 F.3d 1362, 1364 (3d Cir. 1993), modified on other grounds, 13 F.3d 58 (3d Cir. 1993).

. Because the New Jersey Supreme Court has not yet decided whether the XCA’s notice requirement applies to CEPA claims, it was the duty of the district court to predict how the New Jersey Supreme Court would rule if faced with the issue. See Nationwide Mutual Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir.2000). Our review of the district court's prediction is plenary. Id.

.On June 13, 2002, we entered an Petition Certifying a Question of Law to the New Jersey Supreme Court pursuant to Rule 2:12A of the Rules Governing Appellate Practice in *380 the New Jersey Supreme Court and the Appellate Division of the Superior Court. The question certified was: "Whether the Tort Claims Act's 90-day notice of claim requirement, N.J. Stat. Ann. § 59:8-8, applies to a public employee’s retaliation claim under the Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19-3, against a municipality and its supervisory personnel.” However, by Order dated July 5, 2002, the New Jersey Supreme Court denied our Petition for Certification.

. "In predicting how the highest court of the state would resolve the issue, we must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.” Nationwide Mutual Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir.2000) (citation and internal quotations omitted).