OPINION OF THE COURT
JORDAN, Circuit Judge.
Appellant Vicki Smith filed a complaint in the United States District Court for the Middle District of Pennsylvania against the Central Dauphin School District, Barbara Hasson, Yvonne Hollins, and Richard Mazzatesta (collectively the “Appellees”) under 42 U.S.C. § 1983, alleging that Appellees violated her First Amendment right to free speech by retaliating against her for speaking about a matter of public concern. The District Court granted in part and denied in part two motions for summary judgment brought by Appellees. At trial, the District Court granted the Appellees’ Rule 50 motion for judgment as a matter of law (“JMOL”) on all but one of Smith’s claims, which was against Hasson. The jury then returned a verdict in favor of Hasson, and, pursuant to the District Court’s JMOL ruling and the jury verdict, the Clerk of the Court entered judgment in favor of all Appellees and against Smith.
On appeal, Smith claims that the District Court erred in granting summary judgment and JMOL because the Court improperly segregated her claims into discrete adverse employment actions, rather than analyzing Appellees’ conduct as a whole, and because the Court required proof that each defendant participated or acquiesced in each of the alleged acts of retaliation. Smith also argues that the District Court erred at trial by excluding the testimony of one of her witnesses. Because the outcome of the District Court proceedings is in all respects sound, we will affirm.
I. Factual Background

A. Smith’s Employment and Illness

Smith became a full-time, permanent employee of the Central Dauphin School District (the “School District”) in 1989, when she began teaching and coaching cross-country at old Central Dauphin High School (“old CDHS”).[1] In August 2001, Smith began experiencing persistent symptoms of illness, including shortness of breath, fatigue, and joint problems. She began to suspect her illness was being caused by environmental conditions at old CDHS, so she contacted Tom Ferguson, her teachers’ union representative. Other teachers at old CDHS were also said to have contacted the teachers’ union to complain about environmental conditions at the school and the symptoms they were experiencing. As a result of the complaints, Barbara Hasson, the School District Superintendent, agreed to have Analytical Laboratory Services, Inc. (“ALSI”) test old CDHS for potential health hazards. Testing at old CDHS began on or around February 15, 2002.
Shortly before that, on February 7, 2002, Smith went on sick leave. Her symptoms had worsened during the 2001-02 school year, and she filed complaints *661 about the conditions at old CDHS with the Pennsylvania Departments of Labor and Health. In early to mid-March of 2002, the Harrisburg Patriot-News reported that mold had been discovered at old CDHS. In response to that press report, Hasson appeared on a local news broadcast, stating that old CDHS was safe and did not pose a health risk to students or teachers. Similarly, Richard Mazzatesta, the principal at old CDHS, assured members of old CDHS’s Parent-Teacher-Student Organization (“PTSO”) that ALSI’s tests showed that old CDHS was safe. ALSI’s testing concluded on March 25, 2002, and a final report of its findings was made publicly available on March 26, 2002. The report revealed that mold had, in fact, been found in the auditorium, a sign storage area, and a classroom.

B.Smith’s Return to Old CDHS

In April 2002, Smith’s doctors advised her to resume working at old CDHS, as a test so that they could determine whether the conditions there would aggravate her condition. Prior to Smith going on sick leave on February 7, 2002, Hasson had received complaints from students and teachers that Smith was discussing the old CDHS conditions and her health concerns during class. Accordingly, when Hasson learned that Smith would be returning to old CDHS, she sent a memorandum to Mazzatesta and to Yvonne Hollins, the School District’s Assistant Superintendent for Secondary Education, instructing them to meet with Smith and tell her to teach only the curriculum. When Smith arrived at work on the morning of April 29, 2002, Mazzatesta and Hollins spoke with Smith as Hasson had directed.
Smith’s symptoms reappeared within twenty-four hours of returning to old CDHS, and she once again went on medical Lave on May 16, 2002, on the advice of her physicians. The School District transferred Smith from old CDHS to Linglestown Junior High School (“LJHS”) for the 2002-03 school year, which was believed to be an environmentally safe place for her to teach, since it was a newer building and had recently undergone procedures for mold removal, a process known as “remediation.”

C. Smith’s Press Release and Mazzatesta’s Conversation with Hoachlander

On June 12, 2002, Smith issued a press release, which a newspaper turned into an article with the headline, “Local Teacher Breaks Silence on Toxic Mold In C.D. High.” In the article, Smith discussed her health problems, her complaints to the Departments of Labor and Health, and her belief that the School District had turned a blind eye to the health concerns of its teachers and students.
After the press release, Mazzatesta spoke with Debra Hoachlander, a parent member of the PTSO. She told Mazzatesta that Smith had been sending her e-mails about the environmental conditions at old CDHS. According to Hoachlander, Mazzatesta replied that, in his opinion, Smith was spreading falsehoods through the media about the conditions at old CDHS. Smith also claims that Mazzatesta asked Hoachlander to forward Smith’s emails to him, and offered to view Smith’s e-mails on Hoachlander’s home computer. Mazzatesta testified at trial that he simply told Hoachlander he would be willing to look at the e-mails if Hoachlander so desired. He vehemently denied ever offering go to Hoachlander’s house to view the e-mails.

D. LJHS and the Family Medical Leave Act

After Smith was transferred to LJHS for the 2002-03 school year, mold was *662 discovered on that campus as well. Although the mold was discovered on June 14, 2002, Hasson did not inform Smith of the mold at LJHS until September 27, 2002, when the School District was in the process of remediating the affected area. Smith continued teaching at LJHS through the 2002-03 school year, but she was still experiencing health problems. Smith’s doctors informed her and Hasson of their concern that neither CDHS nor LJHS were safe environments for Smith, and they advised that Smith not return to either school. During the summer of 2003, Ferguson, the union representative, began discussing with Hasson and Hollins alternative work arrangements for Smith. During those discussions, Hollins mentioned the possibility of Smith requesting benefits under the Family Medical Leave Act (“FMLA”), but Ferguson informed Hollins that an FMLA solution was not in Smith’s best interests and that Smith wanted to continue to teach. By the end of August 2003, the School District was convinced that it did not have a suitable alternative position for Smith for the 2003-04 school year.
On August 25, 2003, the School Board approved FMLA leave for Smith, despite Smith’s never having requested such leave. It is unclear who actually requested FMLA leave for Smith, but, in any event, on the advice of Ferguson, Smith accepted the leave.

E. New Central Dauphin High School

In April 2004, Smith learned that, for the 2004-05 school year, she would be teaching at a newly constructed Central Dauphin High School (“new CDHS”), which had been built while she was on FMLA leave. When Smith began at new CDHS, her working conditions were different than they had been at old CDHS in at least three ways. First, instead of teaching the classes she had taught before, she was assigned to teach classes with which she was unfamiliar. Second, unlike at old CDHS, where Smith had been assigned a permanent classroom, she became a “floater” at new CDHS, meaning that she was required to teach in several different classrooms throughout the day. Third, while Smith had previously been an assistant cross-country coach at old CDHS, though not at the conclusion of her time there, she did not coach at new CDHS at all.

i. Teaching Assignment

The process for determining which teacher would teach which subjects in the social studies department of CDHS (both old and new) began in April of each year, when the department head conferred with the teachers to determine which subjects they wanted to teach. The department head would then convey that information to the principal, who decided which subjects would be taught by which teachers the following school year.
In April 2004, upon learning of her assignment to new CDHS, Smith contacted Kathy Eckert, the head of the social studies department and asked if she would be allowed to teach the same subjects that she had taught at old CDHS, namely multicultural history and sociology. Eckert recommended to Mazzatesta that Smith teach those subjects during the 2004-05 school year, despite the fact that another teacher, Mr. Osovella, had taught them during the 2003-04 school year, while Smith was on FMLA leave. Mazzatesta asked Osovella whether he would drop those courses so that Smith could teach them, but Osovella demurred. Therefore, Mazzatesta assigned the courses to Osovella instead of to Smith for the 2004-05 school year. The next year, Mazzatesta again assigned Osovella to teach those *663 courses. Smith instead taught U.S. Government and U.S. History.

ii. No Permanent Classroom for Smith at new CDHS

Mazzatesta decided which teachers would be given permanent classrooms for the school year and which teachers would be required to move about during the school day and teach in several different classrooms. He made this decision based on the “building seniority” of each teacher. The longer a teacher had worked in the building, the more likely that teacher was to receive a permanent classroom assignment. The decision was not based on the teacher’s length of service in the School District. Thus, for example, if a teacher who had twenty years of experience in the School District transferred to new CDHS, that teacher would not displace a teacher with five years in the School District who had been at new CDHS for those five years. Because the faculty in its entirety moved to new CDHS when the school opened in 2004, Mazzatesta carried over the teachers’ building seniority from old CDHS.
Mazzatesta had already made classroom assignments when he learned, in June 2004, that Smith would be returning to new CDHS. Further, because Smith had been absent from CDHS for two years, Mazzatesta gave her no building seniority upon her return. Therefore, Smith was not given a permanent classroom during the 2004-05 school year or the 2005-06 school year. Instead, over the course of the school day, she was required to work in six different classrooms located on two different floors.

iii. Assistant Coaching Position on CDHS’s Cross-Country Team

Smith had been the assistant coach for the cross-country team at old CDHS each school year from 1988 through the fall season in 2002.[2] The procedure for hiring an assistant coach in the School District began with the head coach asking a person to be the assistant coach for the team. If that person agreed, the head coach submitted her name to the Athletic Director of the School District. The Athletic Director could discuss the nominations with the principal of the school at which the person was to coach. The Athletic Director then submitted the name of the proposed assistant coach to the School Board for the final decision as to whether the person would be hired as an assistant coach.
Rich Leuschner, the CDHS cross country head coach, asked Smith in the spring of 2003 if she would like to be assistant coach again in the fall. She said yes, and Mr. Leuschner submitted her name to the Athletic Director and to Defendant Mazzatesta, both of whom approved. Smith subsequently took FMLA leave for the 2003-04 school year. Due to the fact that she was being recommended for a position at old CDHS, the very building that she believed had caused her illness, the School Board decided that Smith should not be allowed to coach cross-country at old CDHS while on FMLA leave. Smith did not coach cross-country while at new CDHS.
II. Procedural History
Smith filed this lawsuit on May 17, 2005, and shortly thereafter filed an amended complaint alleging that the Central Dauphin School District, Hasson, Hollins, and Mazzatesta had violated her First Amend *664 ment free speech rights by retaliating against her for speaking out about the environmental conditions at old CDHS.

A.Motions for Summary Judgment

Prior to trial, the District Court granted in part and denied in part two motions for summary judgment. In the first of those decisions, the District Court identified the following eight retaliatory actions allegedly taken by the Appellees: (1) the School Board placing Smith on FMLA leave; (2) the School Board denying Smith the assistant coaching position; (3) Hasson commenting to the press about conditions at old CDHS, in response to reports of mold at the school; (4) Mazzatesta stating that Smith was spreading falsehoods about conditions at old CDHS; (5) Mazzatesta and Hollins instructing Smith to teach only the curriculum; (6) Hasson withholding information about mold at LJHS; (7) Mazzatesta assigning Smith to teach unfamiliar courses; and (8) Mazzatesta denying Smith a permanent classroom at new CDHS. Of these eight actions, the District Court held that, even if proved at trial, only five were actionable under § 1983: placing Smith on FMLA leave; denying her the assistant coaching position; withholding information about mold at LJHS; assigning her unfamiliar courses; and failing to give her a permanent classroom at new CDHS. Thus, summary judgment was denied with respect to those five acts but was granted with respect to the other three.
Next, the District Court examined the role of each defendant in each of the five retaliatory actions and limited each defendant’s potential liability to the acts in which each had participated or acquiesced. The Court concluded that, at most, the evidence showed that Hasson participated in placing Smith on FMLA leave, denying Smith the assistant coaching position, and withholding information from Smith about LJHS; that Mazzatesta, participated in assigning Smith unfamiliar courses and denying her a permanent classroom; and that Hollins participated in placing Smith on FMLA leave. Summary judgment was granted to each defendant with respect to all other acts for which there was no evidence of their personal involvement.
The District Court conducted a similar analysis with respect to the second motion for summary judgment, which pertained to the School District and its potential liability as a municipality. After addressing municipal liability, the Court concluded that the School District could only be liable, if at all, for placing Smith on FMLA leave and failing to hire her as assistant coach.

B. Request for Continuance

Trial was set for August 20, 2007. Approximately one week prior to that date, Ferguson, who was one of Smith’s witnesses, suffered a heart attack. Smith sought to delay the trial date until such time as Ferguson could appear to testify. The issue was brought the District Court’s attention through a request, but no formal motion for continuance was filed. In an August 15, 2007 order, the District Court denied the request for continuance and instead ruled that Smith’s counsel would be allowed to present portions of Ferguson’s videotaped deposition at trial.

C. Exclusion of Hoachlander’s Testimony

On the second day of trial, Smith called Debra Hoachlander to testify. As Smith’s counsel began questioning Hoachlander concerning Hoachlander’s membership in the PTSO and service to the school, defense counsel objected on relevance grounds. The Court then asked Smith’s counsel, “what is the proffer?” (App. at *665 472.) Smith’s counsel responded by identifying three things that would be covered by Hoachlander’s testimony. First, as a parent active at the school, Hoachlander had direct contact with a School Board member and potential witness named Mausner. Second, although Mausner had not yet testified, Hoachlander’s testimony would, counsel said, impeach Mausner’s credibility. Third, Hoachlander was prepared to contradict Mazzatesta’s earlier trial testimony that he had never requested to see Smith’s e-mails to Hoachlander and never offered to view Smith’s e-mails at Hoachlander’s residence.
The Court then asked counsel to explain the relevance of the proffered testimony and the following colloquy ensued:
Plaintiffs counsel: The relevance, Your Honor, is the school board now knew about what was going on about Ms. Smith. The school board is the policy maker to the district, so I think it goes to show that the school district itself was aware of what was going with Ms. Smith, [sic]
The Court: And?
Plaintiffs counsel: I’m sorry. I think it goes directly to the Monell here.[3]
* * *
The Court: What policy? What policy is involved?
Plaintiffs counsel: Well, Your Honor, it’s the policy that the school board and the school district turned a blind eye on to what was happening to Ms. Smith, turned a blind eye to her complaints. * *
The Court: Okay. So what issue does that involve of the ... issues that are involved in this case?
Plaintiffs counsel: Your Honor, one, I think it goes to retaliation. For the retaliation and for the punitive damages, Your Honor, we have to show an evil motive. If the school district went out of its way to keep this problem from the parents, to keep this problem from the public, and then Ms. Smith informed the public of it, that would, one, show that they had a motive to retaliate against her. The fact that they went to such great lengths to cover up this problem shows the lengths they’ll go to retaliate against Ms. Smith. Furthermore, Your Honor, it goes to a course of conduct. Ms. Smith, as well as her physician, specifically asked for information about the environmental conditions on Linglestown High School prior to her starting. It is clearly one of the claims this Court has left in. The reason they wanted that information was so Ms. Smith could know the type of environment she was walking into and make sure it wouldn’t, as it did, exacerbate her condition. The fact that they covered that up and the fact that they covered up the situation to begin with, Your Honor, I believe, a continuing course of conduct, [sic] By covering up before clearly shows them covering up and denying her the information about Linglestown was intentional, Your Honor.
$ *
Defense Counsel: First off, if the purpose of this witness is to impeach Mr. Mausner, Mr. Mausner should be given the opportunity to testify first.
The Court: Right.
Defense counsel: ... Number two, as the Court indicated previously, this is about whether or not the Plaintiff was *666 given information regarding Linglestown Junior High School and whether she was retaliated against, not whether the school district hid information from every individual on Earth. That’s not what this case is about. The Monell issues pertain to the coaching position and the FMLA only. And that was by this court’s order. That’s it. The school district is not on the hook for any other claims. Coaching, FMLA leave, this witness is irrelevant to those issues.
The Court: Sustain your objection. She comes off.
(App. at 472-475.)

D. JMOL Motion

After Smith presented her case-in-chief, Appellees orally moved for JMOL, arguing that Smith failed to present evidence sufficient for a reasonable jury to find in her favor on any of her claims. The Court granted the motion as to Hasson and Hollins on the FMLA issue, because of insufficient evidence that they had personally participated in the alleged actions surrounding Smith’s being put on FMLA leave. The Court made the same ruling as to Hasson’s involvement with the decision to not hire Smith as an assistant coach. The Court also granted the motion with respect to the School District, finding that the evidence was legally insufficient to establish that the School District’s involvement in the decisions respecting the FMLA leave and the coaching position were substantially motivated by Smith’s speech. The Court reasoned that “merely showing that there was speech that preceded certain action [Jwithout more[,] is legally insufficient to present to the jury.” (App. at 572.)
The Court also granted JMOL to Mazzatesta with respect to assigning Smith to teach unfamiliar courses and denying her a permanent classroom, because “there was an insufficient showing to go to the jury as to whether [Smith’s][4] actions were a substantial and motivating factor in his actions.” (App. at 573.) Finally, the Court stated that, with respect to all issues as to which JMOL had been granted, there was also “no evidence sufficient ... to go to the jury to find that the Plaintiff incurred an actual injury as to those actions.” (App. at 573.)
The only issue that went to the jury was Smith’s claim against Hasson for allegedly withholding information regarding environmental conditions at LJHS. On that issue, the jury returned a verdict in favor of Hasson. The Clerk of the Court then entered judgment in favor of all Defendants and against Smith on August 23, 2007. On September 21, 2007, Smith filed a timely notice of appeal.

E. Motion for Sanctions

On the same day judgment was entered, Smith’s counsel filed a motion with the District Court seeking sanctions against Appellees and their counsel, James E. Ellison, claiming that Ellison improperly failed to accept service on behalf of Hasson and Hollins, made false representations in the Appellees’ answer, and improperly raised the attorney-client privilege during depositions. The District Court denied the motion because it was untimely and because the Court determined that Ellison had acted in good faith.
III. Discussion[5]
On appeal, Smith claims that the District Court erred by granting partial sum *667 mary judgment, by denying her motion for a continuance, by excluding Hoachlander’s testimony at trial, by granting Appellees’ JMOL motion, and by denying her motion for sanctions.
We exercise plenary review over orders granting summary judgment. Lauren v. DeFlaminis, 480 F.3d 259, 265-66 (3d Cir.2007). Thus, we will affirm those orders if our review reveals that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Id. at 266. In determining whether summary judgment is warranted, we review the facts in the light most favorable to the non-moving party, and draw all reasonable factual inferences in the party’s favor. Id. We also exercise plenary review over an order granting or denying a JMOL motion. Goodman v. Pa. Turnpike Comm., 293 F.3d 655, 664-65 (3d Cir.2002). We review relevance decisions for abuse of discretion. Pfeiffer v. Marion Ctr. Area Sch. Dist., 917 F.2d 779, 781 (3d Cir.1990). Likewise, we review a district court’s ruling on continuances and sanctions for abuse of discretion. Fontana v. United Bonding Ins. Co., 468 F.2d 168, 169 (3d Cir.1972) (“Continuance of trial is a matter of discretion with the trial court which will not be disturbed unless a clear abuse has been shown.”); Naviant Marketing Solutions, Inc. v. Larry Tucker, Inc., 339 F.3d 180, 185 (3d Cir.2003) (“This Court reviews a District Court’s decision on a motion for sanctions under Rule 37 for abuse of discretion.”); see also Simmerman v. Corino, 27 F.3d 58, 61 (3d Cir.1994) (“On review, we apply an abuse of discretion standard to all aspects of the district court’s Rule 11 determination.”).

A. Motions for Summary Judgment

We follow a three-step burden-shifting process when examining a public employee’s § 1983 claim of retaliation for engaging in activity protected under the First Amendment. Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir.2005). “First, the employee must show that the activity is in fact protected. Second, the employee must show that the protected activity ‘was a substantial factor in the alleged retaliatory action.’ Third, the employer may defeat the employee’s claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct.” Id. (citations omitted). When there is more than one defendant, the employee must show that each defendant individually participated or acquiesced in each of the alleged constitutional violations. C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir.2005); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir.1997).
As we noted in Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir.1997), “the expressive rights of public employees are not as expansive as those of citizens outside the public work force.” Therefore, “[o]nly a subset of speech that is protected for citizens is also protected for public employees.” Id. However, public employees do have a First Amendment right to speak on matters of public concern. Brennan v. Norton, 350 F.3d 399, 412 (3d Cir.2003) (“A public employee has a constitutional right to speak on matters of public concern without fear of retaliation.”) (quoting Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir.2001)). Here, it is undisputed that Smith’s speech pertained to a matter of public concern and thus satisfies step one.
The battle is over step two, which, as noted by the District Court, actually in *668 volves two sub-steps.[6] First, courts must examine the complained of acts and determine whether they are sufficient to give rise to a First Amendment retaliation claim. In this Circuit, the test for determining whether an alleged act of retaliation is sufficient to give rise to a retaliation claim is whether the act is “sufficient to deter a person of ordinary firmness from exercising [her] First Amendment rights.” McKee v. Hart, 436 F.3d 165, 170 (3d Cir.2006). The threshold for meeting this standard is low; all that the employee must show is that the acts attributed to the defendant are more than de minimis. O’Connor v. City of Newark, 440 F.3d 125, 127-28 (3d Cir.2006). Even when conduct falls below that minimum threshold and actionable, a plaintiff may still satisfy the test by showing a campaign of harassment that, although de minimis in its isolated details, is substantial due to its cumulative impact. Brennan v. Norton, 350 F.3d 399, 419 n. 16, 422 n. 17 (3d Cir.2003); Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir.2000). Second, courts must examine whether the employee’s speech was a substantial or motivating factor for the alleged acts. Suppan, 203 F.3d at 236. We have noted that:
To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that proof, the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.
Lauren v. DeFlaminis, 480 F.3d 259, 267 (3d Cir.2007).
Smith contends the District Court erred in two ways in granting partial summary judgment and JMOL. First, relying on Brennan and Suppan, Smith claims that the District Court improperly analyzed each alleged act of retaliation in isolation and failed to examine the cumulative impact of all the allegedly retaliatory actions. Second, Smith says, the Court’s error in segregating her claims into discrete adverse employment actions was compounded by the Court’s improperly looking “simply at the evidence of the individual defendant’s direct involvement in each isolated act to determine their liability.” (Appellant’s Op. Br. at 17.) While Smith acknowledges that “the notion of actual participation ... in general is still the guiding principle” (Appellant’s Op. Br. at 17), she contends that, under Robinson v. City of Pittsburgh, evidence of personal involvement is not required in cases such as hers. According to Smith:
Where the actionable conduct includes both discrete adverse employment actions and more general pattern of behavior aspects, an individual can be liable under either so long as the legal conditions are met, and they are in this case—each of the individual Defendants, and the School District itself, is shown to have variously participated in actions that constitute discrete adverse employment actions, and a collective pattern of retaliation, and the lower court completely cut off the full scope of Plaintiffs claims on summary judgment.
(Appellant’s Op. Br. at 23-24.) Smith goes on to state that because the District Court applied the wrong standard, her claims *669 were “irretrievably parsed, and ultimately lost, without [her] having been able to present the evidence in its entirety on the true history of the facts and circumstances surrounding her claims under Section 1983.” (Appellant’s Op. Br. at 17-18.)
In Brennan, one of the cases Smith cites in claiming the District Court erred by analyzing the retaliatory acts individually, we analyzed the plaintiffs claims precisely the way the District Court did here. We identified eleven retaliatory acts, examined each individually, and found that, while some of the acts did rise to the level of a First Amendment violation, others did not because they were insufficient to deter a person of ordinary firmness from exercising his or her rights. Brennan, 350 F.3d at 418-19. With respect to the actionable conduct, we found that in some instances the evidence was insufficient to determine which defendants were responsible for the various acts. Id. Finally, we determined that, even when the evidence was sufficient to show what each defendant had done, it was insufficient to establish that the plaintiffs constitutionally protected speech motivated the defendants to take action against the plaintiff. Id.
Just as in Brennan, the District Court here identified the alleged retaliatory acts and determined that some acts potentially rose to the level of a First Amendment violation while others did not. The District Court next examined the evidence of each defendant’s involvement in those acts which were potentially violative of the First Amendment, and the Court rightly limited each defendant’s potential liability to the acts for which there was evidence of that defendant’s personal involvement. Thus, the District Court followed our approach in Brennan and did not err in granting partial summary judgment. Although Smith is correct that a pattern of de minimis conduct can become actionable in appropriate circumstances, the facts of this case do not present the sort of campaign of harassment that was at issue in Suppan. Rather, the facts are more akin to those in Brennan, and the District Court correctly analyzed the case under that framework.
Further, contrary to Smith’s assertions, a plaintiff must still show each defendant’s personal involvement in the retaliatory acts in cases involving a campaign of harassment. Our holding in Robinson in no way supports Smith’s version of the law, as we plainly stated that “a defendant in a § 1983 action must have personal involvement in the alleged wrongs.” 120 F.3d at 1294 (emphasis in original). In Robinson we simply observed that, with respect to supervisory liability, the requirement of personal involvement may be satisfied by proving a supervisor’s “actual knowledge and acquiescence” in the alleged wrongs. Id.
Finally, the District Court indicated that, although some of the complained of acts did not rise to the level of a constitutional violation, evidence of those acts could nevertheless be relevant. For example, with respect to Mazzatesta’s statements to Hoachlander, the Court stated “[w]hile these words or acts do not provide the basis for a retaliation claim in terms of injury to [Smith], they do suggest that the adverse employment actions described above were motivated by animus engendered by [Smith’s] public speech.” (App. at 59.) Thus, the District Court’s summary judgment orders did not prevent Smith from “presenting the evidence in its entirety on the true history of the facts and circumstances surrounding her claims under Section 1983” (Appellant’s Op. Br. at 17-18), as she now claims.

B. JMOL Motion

With respect to the claims that survived summary judgment, Smith argues *670 that, in light of the fact that the standards governing motions for summary judgment and JMOL are the same, the District Court erred in granting JMOL because the evidence presented at trial was the same as the evidence at summary judgment. Contrary to Smith’s assertion, however, the evidence presented at trial was not the same as the evidence at the summary judgment stage. For example, at summary judgment, the District Court relied on Smith’s deposition testimony that a social studies teacher in her first year of teaching at new CDHS received a permanent classroom for the 2005-06 school year, while Smith was assigned to be a floater. At trial, however, Smith admitted that the available classroom for the 2005-06 school year was given to a teacher with more building seniority than she had, and she was unable to show that she was ever denied a permanent classroom in favor of a teacher with less building seniority. Similarly, Smith admitted at trial that she had no evidence that Mazzatesta assigned her to teach U.S. Government and U.S. History in retaliation for her public speech.
With respect to the FMLA leave, Smith was unable to present any evidence at trial showing that Hasson or Hollins had any involvement in the decision to approve that leave. By Smith’s own admission, the School Board made the decision to place her on FMLA leave, and she was unaware whether Hasson played any role in that decision. Hollins testified that she had no involvement with the decision to grant Smith FMLA leave, and Smith produced no evidence to the contrary. Further, the evidence at trial showed that the School Board made the decision based on Smith’s medical records and directives from her doctors, not out of a desire to retaliate against her for her constitutionally protected speech.
With respect to the coaching position, Smith admitted that she had no knowledge of Hasson’s involvement, and the trial testimony showed that Hasson had no involvement in the decision. Smith was also unable to refute testimony proffered by Appellees that the School Board denied her the coaching position solely because of her health condition and the need to prevent her from being exposed to mold at the old CDHS building.
On appeal, Smith has not cited any evidence to support her contention that JMOL was improperly granted. Rather, she incorrectly claims that the evidence at summary judgment and at trial were the same and alleges that the District Court failed to understand the inferences to which she was entitled. We do not agree. Accordingly, the District Court’s JMOL ruling will be upheld.

C. Testimony of Debra Hoachlander

Smith contends that the District Court improperly excluded Hoachlander’s testimony as irrelevant. “Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Fed. R.Evid. 401. “All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.” Fed.R.Evid. 402.
Smith argues that Hoachlander’s testimony was relevant to show that Mazzatesta was motivated by animosity towards Smith, and not some “otherwise innocent and uninterested concern for her personal affairs.” On this point, we are inclined to agree with Smith. Indeed, the *671 District Court’s summary judgment order suggests that the conversations between Mazzatesta and Hoachlander were relevant for that very reason:
Ms. Hoachlander testified she felt that Defendant Mazzatesta was asking her to forward Plaintiffs emails in an effort to discredit Plaintiff. While these words or acts do not provide the basis for a retaliation claim in terms of injury to Plaintiff, they do suggest that the adverse employment actions described above were motivated by animus engendered by Plaintiffs public speech---From the foregoing, the court finds that the Plaintiff has satisfied her summary judgment burden of adducing evidence that her exercise of free speech was a “substantial” or “motivating” factor in the adverse employment actions alleged.
(App. at 59.) It is therefore likely that the District Court erred in preventing Ms. Hoaehlander’s testimony on that point, but we need not resolve the issue because, although Hoachlander’s testimony may have been relevant, its exclusion was harmless.
Federal Rule of Evidence 103(a) provides that an evidentiary ruling is not reversible error “unless a substantial right of a party is affected....” Fed.R.Evid. 103(a). “Under this test, a reviewing court should affirm the District Court despite the error if the reviewing court believes ‘that it is highly probable that the error did not contribute to the judgment.’” Renda v. King, 347 F.3d 550, 556 (3d Cir.2003) (quoting McQueeney v. Wilmington Trust Co., 779 F.2d 916, 924 (3d Cir.1985)) (emphasis in original).
The evidence at trial overwhelmingly shows that Mazzatesta assigned Smith different courses than she previously taught and denied her a permanent classroom at new CDHS on the basis of building seniority, not out of a desire to punish Smith or retaliate against her for her constitutionally protected speech. Further, Smith began speaking out on the environmental conditions at old CDHS during the 2001-02 school year and issued her press release in June of 2002. The conversation between Mazzatesta and Hoachlander also took place in June of 2002, while Mazzatesta’s allegedly retaliatory acts occurred more than two years later, in the fall of 2004. Thus, Hoachlander’s testimony does not change the fact that, with respect to Mazzatesta’s actions, Smith was unable to show (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, (2) a pattern of antagonism coupled with timing to establish á causal link, or (3) evidence as a whole from which the trier of fact could infer causation. See Lauren, 480 F.3d at 267. Thus, it is highly probable that the error did not contribute to the judgment.
Smith’s claims with respect to the sanctions and her motion for continuance do not warrant discussion, as she has not cited a single case to support her arguments and has failed to show that the District Court abused its discretion.
IV. Conclusion
For all of the foregoing reasons, we will affirm the judgment of the District Court.

. In this matter, there are two buildings identified as “Central Dauphin High School." “Old” CDHS was located on Locust Lane, in Lower Paxton Township Pennsylvania. “New” CDHS, located on Piketown Road, West Hanover Township, Pennsylvania, was completed in time for use in the 2004-05 school year. We use "old” and “new” to differentiate between the two buildings.

. In the fall of 2002, Smith was teaching at LJHS but was still allowed to coach cross-country at old CDHS.

. The reference is evidently to Monell v. New York City Dep’t of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the seminal Supreme Court case on municipal liability under § 1983.

. The transcript indicates that the District Judge misspoke at this point, saying "his,” when "her”—meaning Smith’s—actions were the ones as to which Mazzatesta's actions were in turn retaliatory.

. The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. *667 §§ 1331 and 1343. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

. As stated by the District Court, "[ujnder the second prong of the retaliation test, the court must determine whether the acts attributed to Defendants are adverse employment actions and ... then examine whether Plaintiff's speech was a substantial or motivating factor in any adverse employment actions taken.” (App. at 49-50.)